PETER THEODORE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 78341, 78342, 78966, 85610, 85613, 85614.    Filed September 28, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith: Theodore & Theodore, Inc., Docket Nos. 78342 and 85614; National Mutual Casualty Company, Docket Nos. 78966 and 85613; and Peter Theodore, Docket No. 85610.

*Donald G. Tripp, Esq.,* for the petitioners.

*Robert W. Siegel, Esq.,* and *Ralph W. Eisnaugle, Jr., Esq.,* for the respondent.

WITHEY, *Judge:* The respondent has determined deficiencies in the income tax of the petitioners as follows for the indicated years:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Peter Theodore | 78341 | 1953 | $69,620.34 |
| | | 1954 | 54,093.64 |
| | | 1955 | 37,562.43 |
| | 85610 | 1957 | 30,628.99 |
| Theodore & Theodore, Inc. | 78342 | 1953 | 3,948.56 |
| | | 1955 | 11,184.62 |
| | 85614 | 1957 | 88.63 |
| National Mutual Casualty Company | 78966 | 1953 | 17,492.88 |
| | | 1954 | 9,004.26 |
| | | 1955 | 34,552.42 |
| | 85613 | 1957 | 14,501.35 |

Issues presented by the pleadings are the correctness of the respondent's action:

## In the Case of Peter Theodore.

In determining (1) that net income of National Mutual Casualty Company in the amounts of $34,943.33, $40,583.08, $40,657.73, and $40,633.50 for the years 1953, 1954, 1955, and 1957, respectively, was taxable to petitioner for the respective years, or (2) in the alternative, that of the amounts, $98,412.50, $114,296, $114,438, and $114,438, paid in 1953, 1954, 1955, and 1957 to National Mutual Casualty Company as insurance on taxicabs and service cars owned by petitioner, the amounts of $20,441.04, $52,780.62, $41,217.61, and $5,487.55, respectively, were excessive and did not constitute deductions allowable as ordinary and necessary business expenses for the respective years, (3) that payments made by National Mutual Casualty Company to the petitioner in 1953 and 1954 in the amounts of $50,000 and $12,000, respectively, constituted taxable dividends to petitioner for the respective years, (4) that deductions of $500 taken in the petitioner's income tax returns for each of the years 1954 and 1955 for travel and entertainment were not allowable, (5) that during 1955 petitioner received unreported rentals of $8,166.48 from Theodore & Theodore, Inc., and (6) that during 1954, 1955, and 1957 the petitioner received unreported interest in the amounts of $383.69, $915.03, and $824, respectively.

## In the Case of Theodore & Theodore, Inc.

In determining (1) that net income of National Mutual Casualty Company in the amounts of $3,305.92 and $3,821.97 for 1953 and 1955, respectively, was taxable to petitioner for such years, or (2) in the alternative, that of the amounts of $9,310.62 and $10,764 paid by petitioner during 1953 and 1955, respectively, to National Mutual Casualty Company as insurance on taxicabs and service cars, the amounts of $7,574.76 and $7,270.47, respectively, were excessive and did not constitute deductions allowable as ordinary and necessary business expenses for the respective years, (3) that a payment of $11,190 in 1957 made to National Mutual for insurance on taxicabs and service cars owned by petitioner was excessive in the amount of $7,572.51, (4) that a portion of the amounts deducted by petitioner in its income tax returns for 1953, 1955, and 1957 for depreciation of improvements on leased real properties was not deductible, and (5) that $364.95 of a deduction taken for 1957 for contributions was not allowable.

## In the Case of National Mutual Casualty Company.

In determining (1) that for the years 1953, 1954, 1955, and 1957 the petitioner was not taxable as a mutual insurance company but

taxable as an insurance company other than life or mutual, and (2) that assessments of the deficiencies determined against petitioner for 1953, 1954, and 1955 were not barred by the expiration of the applicable statutory periods of limitations.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found as stipulated.

Peter Theodore, sometimes hereinafter referred to as Peter, filed his Federal income tax returns for 1953, 1954, 1955, and 1957 with the district director of internal revenue in Detroit, Michigan.

Theodore & Theodore, Inc., sometimes hereinafter referred to as Theodore Corporation, is a Michigan corporation organized on March 6, 1947, and has its principal place of business in Detroit, Michigan. It filed its Federal income tax returns for 1953, 1955, and 1957 with the district director in that city.

National Mutual Casualty Company, sometimes hereinafter referred to as National Mutual, is an insurance corporation organized, operated under, and complying with the laws of the State of Michigan and the rules and regulations of the Michigan insurance commissioner and has its principal place of business in Detroit, Michigan. It filed its Federal income tax returns for 1953, 1954, 1955, and 1957 with the district director in Detroit.

Peter Theodore was born in Yugoslavia and came to the United States in 1913. At first he worked as a laborer in Chicago, Illinois, and in 1915 went to Detroit where he was employed in a factory. Later he drove a taxicab in Detroit and in 1926 purchased his first taxicab which he drove in Detroit. Thereafter he began purchasing additional cabs. About 1935 or 1936 Cyril Theodore and Teddy Theodore, brother and nephew, respectively, of Peter, became associated with him as partners in the conduct of the taxicab business and operated under the name of Theodore & Theodore. Throughout the existence of the partnership Cyril Theodore engaged in the maintenance or repairing of taxicabs. Theodore Corporation upon its formation in 1947 took over the assets and business of the partnership.

In 1951 Peter Theodore, individually owned the Yellow Cab taxicab operation in Pontiac, Michigan, and the Yellow Cab taxicab operation in Jackson, Michigan. In addition he was the principal stockholder in Bay City Taxicab Company which operated in Bay City, Michigan. In 1953 the assets employed in and the business of the foregoing operations were taken over by Peter Theodore, Inc., of which Peter was the sole stockholder. Thereafter and through 1957 that corporation continued the conduct of taxicab operations in the foregoing cities.

The purpose for the formation of Theodore Corporation as stated in the corporation's articles of incorporation was to own, lease, rent out, and operate taxicabs and other means of motor vehicle transpor-

tation for hire; to own and operate garages and gasoline stations; and to do other things necessary in the operation of a taxicab business or business of operating motor vehicles for hire.

Theodore Corporation began operations with a paid-in capital of $217,000 and an outstanding capital stock of 21,700 shares of common stock of a par value of $10 each. At the time of beginning operations or shortly afterwards the stock of the corporation was owned as follows:

|  | Shares |
|---|---|
| Cyril Theodore | 9,499 |
| Teddy Theodore | 9,700 |
| Peter Theodore | 2,501 |

The foregoing stockholders together with Catherine Mazey comprised the corporation's first board of directors.

The first officers of Theodore Corporation were as follows:

Peter Theodore, president and treasurer.
Cyril Theodore, vice president.
Teddy Theodore, secretary.
Paul E. Gringle, assistant secretary.

In order to operate a taxicab in the City of Detroit, Michigan, it is first necessary to obtain what is known as a "bond plate." The bond plate initially is issued by the City of Detroit through its police department. There is a ceiling on the total number of bond plates that can be issued. During 1953 through 1957 the authorized total number of cab bond plates was outstanding and as a consequence one could not be obtained from the City of Detroit. In order to obtain a bond plate during those years it was necessary to purchase the plate from an owner. In 1953, three bond plates were sold by the owner or owners thereof at $5,000 each and in 1955 there was a sale of one bond plate for $3,500.

During 1953 through 1957 Theodore Corporation operated taxicabs in Detroit, Dearborn, and Grosse Pointe. It operated 175 taxicabs in Detroit. These were operated under the name of "Radio Cab," a name which it was permitted to use as a member of Radio Cab, Inc., a nonprofit corporation, which provided radio dispatching service for its members. The taxicabs operated in Grosse Pointe were operated under the name of "Park Cab." During the same years the corporation operated 15 to 20 taxicabs in Dearborn. During those years the corporation owned the bond plates used to operate taxicabs in Dearborn but owned none to operate in the City of Detroit. The 175 bond plates used to operate the 175 cabs in Detroit were owned by Peter Theodore individually. Such bond plates were used by the corporation under lease from Peter who had acquired them either originally from the City of Detroit or had purchased them at his own cost from private sources. The taxicabs operated by the corporation in

Detroit and those operated in Grosse Pointe were owned by Peter individually. Those operated in Dearborn formerly belonged to Peter individually but during 1953 or 1954 were purchased from him by the corporation.

By a lease agreement entered into on December 29, 1951, Peter leased 175 taxicabs and his 175 bond plates to operate in Detroit to Theodore Corporation. The lease was for a term of 1 year, January 1 through December 31, 1952, with the right in the corporation to extend it thereafter from year to year. Under the lease Peter had the right to substitute from time to time other cabs for those covered by the lease. The lease provided that the corporation would pay all taxes, fees, and charges, including annual license plate fees and personal property taxes, which might accrue or be levied by the City of Detroit and the State of Michigan upon the cabs or any substitutes and that at the expiration of the lease or renewal thereof the corporation would return at its expense the leased cabs in good condition, reasonable wear and tear excepted. As rental the corporation agreed to pay Peter on or before the termination date of the lease, or on or before the termination date of any renewal thereof, provided such renewal did not extend more than 1 year, an amount equal to the allowable depreciation of the cabs, to be determined in accordance with the applicable Internal Revenue Code, the interpretations thereof, and the rulings of the Commissioner of Internal Revenue. If any interpretation or ruling of the Commissioner or the judgment of any court or conferees changed such allowable rate of depreciation, the rent so paid was to be adjusted accordingly between Peter and the corporation. The lease specifically provided that the corporation would hold Peter harmless from any claims for damages arising out of the use or possession of the cabs and that it would defend any suit or proceeding brought against him, his agents, and employees arising therefrom.

On December 31, 1953, Peter and Theodore Corporation entered into another lease agreement respecting the 175 bond plates for operating taxicabs in Detroit and the 175 cabs then in use by the corporation and several limousines, supervisors' cars, and service cars, all owned by Peter. The lease was for the year January 1 through December 31, 1954, with the right in the corporation to extend it thereafter from year to year. With three exceptions the remaining provisions of the lease were substantially the same as those of the lease of December 29, 1951. One exception was that in the lease of December 31, 1953, Peter reserved to himself the right to place advertising matter in or to sell advertising space in the cabs. Another

exception was that in addition to paying Peter rental in an amount equal to the allowable depreciation on all of the vehicles, the corporation agreed to make payment to Peter as rent the following amounts:

$53.50 per month for each taxicab.
35.50 per month for each limousine.
8.00 per month for each supervisor's car.
9.50 per month for each service car or service truck.

The third exception was that in consideration of the rental to be paid by the corporation to Peter, the latter agreed to provide with respect to each cab insurance protection for the benefit of himself and the corporation covering liability for bodily injury to the maximum amount of $20,000 for each person and $40,000 for each accident, and liability for property damage of $5,000 for each accident; or such additional amounts and classes of coverage as Peter and the corporation might thereafter mutually agree on. Otherwise the corporation was to hold Peter harmless for any claim for damages arising out of the use or possession of the cabs.

Theodore Corporation would have been unable to engage in business as the operator of taxicabs in Detroit if Peter had refused to lease his bond plates and cabs to it.

During 1953 through 1957 Theodore Corporation operated a gas station owned by it and all gasoline used in the conduct of its taxicab business was purchased through its own station.

Safety records on all of its drivers were maintained by Theodore Corporation during 1953 through 1957. The corporation attempted to maintain a staff of safe and competent drivers and discharge those drivers whom it regarded as unsafe. The fact that "Radio Cabs" were closely supervised in their operation tended to result in a low loss ratio for the foregoing years.

Following its formation in 1947 Theodore Corporation operated profitably and by the end of 1951 had an earned surplus in excess of $190,000.

In its Federal income tax returns for the indicated years the corporation reported net income (or loss) and tax due thereon as follows:

| Year | Net income | Tax due |
|------|-----------|---------|
| 1952 | $86,005.95 | $39,073.16 |
| 1953 | 6,256.04 | 1,764.34 |
| 1954 | (25,876.91) | |
| 1955 | 49,555.03 | 20,268.62 |
| 1956 | (2,611.85) | |
| 1957 | (19,303.38) | |

Theodore Corporation reported in its Federal income tax returns for the indicated years the following with respect to the time devoted to its business by its officers, the percentage of its stock owned by each, and the compensation of each:

Peter Theodore—President

| Year | Time devoted to corporation's business | Percentage of stock owned | Compensation |
|---|---|---|---|
| 1952 | Part | 11.5 | $27,499.92 |
| 1953 | Part | 11.5 | 27,499.92 |
| 1954 | Part | 11.5 | 27,499.92 |
| 1955 | Full | 11.5 | 27,499.92 |
| 1956 | Full | 11.5 | 27,499.92 |
| 1957 | Full | 11.5 | 20,624.92 |

Cyril Theodore—Vice president

| Year | Time devoted to corporation's business | Percentage of stock owned | Compensation |
|---|---|---|---|
| 1952 | Part | 43.8 | 9,900 |
| 1953 | Part | 43.8 | 9,900 |
| 1954 | Part | 43.8 | 9,900 |
| 1955 | Part | 43.8 | 9,900 |
| 1956 | Part | 43.8 | 5,775 |
| 1957 | | ¹ 43.8 | |

Teddy Theodore—Secretary-treasurer

| Year | Time devoted to corporation's business | Percentage of stock owned | Compensation |
|---|---|---|---|
| 1952 | Full | 44.7 | 9,900 |
| 1953 | Full | 44.7 | 9,900 |
| 1954 | Full | 44.7 | 9,900 |
| 1955 | Full | 44.7 | 9,900 |
| 1956 | Full | 44.7 | 9,900 |
| 1957 | Full | 44.7 | 13,425 |

Mary Theodore—Vice president

| Year | Time devoted to corporation's business | Percentage of stock owned | Compensation |
|---|---|---|---|
| 1956 | Part | | 2,500 |
| 1957 | Part | | 6,000 |

¹ Stock owned by Estate of Cyril Theodore.

For years prior to 1954 Theodore Corporation paid for insurance coverage on the taxicabs it leased from Peter. For 1954 through 1957 the rent paid by the corporation to Peter included the cost of insurance coverage on the taxicabs the corporation leased from Peter. In its Federal income tax returns for the indicated years the corporation took deductions as follows for rent expense and insurance expense with respect to taxicabs leased from Peter:

| Year | Rent expense | Insurance expense |
|---|---|---|
| 1952 | $97,761.43 | $88,797.96 |
| 1953 | 135,213.69 | 107,723.12 |
| 1954 | 94,606.57 | 122,681.50 |
| 1955 | 208,028.55 | 10,764.00 |
| 1956 | 198,053.39 | 10,728.00 |
| 1957 | 257,826.64 | |

In his Federal income tax returns for the indicated years Peter reported rent, expenses, and net income as follows from the leasing of his taxicabs to Theodore Corporation:

| Year | Rent | Depreciation | Insurance | Net income |
|------|------|-------------|-----------|-----------|
| 1953 | $135,213.69 | $135,213.69 | | None. |
| 1954 | 208,902.57 | 94,606.57 | $114,296 | None. |
| 1955 | 199,862.07 | 85,424.07 | 114,438 | None. |
| 1957 | 227,607.15 | 113,169.15 | 114,438 | None. |

Peter's Federal income tax returns for 1953, 1954, 1955, and 1957 show the following with respect to the purchase of taxicabs during the respective years:

| Year of purchase | Number of cabs | Total cost |
|------------------|----------------|-----------|
| 1953 | 110 | $175,153.38 |
| 1954 | 17 | 30,805.00 |
| 1955 | 80 | 131,247.73 |
| 1957 | 41 | 77,848.02 |

National Mutual Casualty Company was organized on October 3, 1921, under the name of Michigan Mutual Plate Glass Insurance Company with a corporate life of 60 years under authority of chapter 3, part 5 of Act 256 of Public Acts of 1917 as amended being chapter 58, Insurance Code of 1956, Mich. Stat. Ann. secs. 24.15800–24.15840.

In 1947 and for a number of years prior thereto Peter's taxicabs were insured by Michigan Mutual Automobile Insurance Company, Traverse City, Michigan. During 1947 Michigan Mutual canceled the workmen's compensation insurance policy Peter carried with it. The company also informed Peter of a proposed increase in the premium on the insurance it was carrying on his taxicabs. Peter protested and the company informed him that its loss experience with respect to the insurance it was carrying on his taxicabs was such that it did not desire to continue the risk it was exposed to on account of the cabs and that it would continue the insurance on the cabs only until such time as he could obtain insurance elsewhere. It is difficult to find an insurer willing to insure taxicabs and Peter became worried about insurance on the cabs. He sought the assistance of his then attorney in finding another insurer for the cabs. The attorney upon investigation ascertained that the charter of Michigan Mutual Plate Glass Insurance Company, Battle Creek, Michigan, could be obtained by making payment to two individuals of the amount of their advances to the company, totaling $12,000, and represented by two "surplus contribution notes," notes payable by the company only out of its surplus and with the approval of the Michigan insurance commissioner.

The original purpose of the Michigan Mutual Plate Glass Insurance Company as stated in its articles of incorporation was "To mutually insure its members against loss by breakage to the glass or plate glass insured." It had continued to carry on and was engaged in that business in 1947.

After determining the status of the Michigan Mutual Plate Glass Insurance Company and its condition and being satisfied that it could be adapted to the insurance needs of Peter, the attorney recommended that Peter acquire its charter. Thereupon Peter made payment of $12,000 to the holders of the surplus contribution notes issued by the company, received from the holders assignment of the notes, and with the approval of the Michigan insurance commissioner acquired the charter of the company. About that time and on September 4, 1947, the articles of incorporation were amended at a special meeting of the members of the company. On September 9, 1947, the amendments were approved by the assistant attorney general and the deputy commissioner of insurance. By the amendments the name of the corporation was changed to National Mutual Casualty Company, and the principal office of the company was changed from Battle Creek to Detroit. The amendments stated the business purposes of the corporation were as follows:

1. To insure against breakage of Plate Glass, local or in transit;
2. To insure any person, partnership or corporation against loss or damage on account of the bodily injury or death by accident of any person, or against damage caused by automobiles, vehicles or draft animals to property of another, for which loss or damage said person, partnership or corporation is responsible, or against all of said contingencies, inclusive of workmen's compensation insurance;
3. To insure against loss or damage from all hazards permitted by the State of Michigan to be written by companies organized under Chapter III, Part V of Act No. 256 of the Public Acts of 1917 as amended.

The directors of National Mutual were Peter, Teddy Theodore, and Chilton Mullikin. Peter was president of the company and Teddy Theodore was its secretary-treasurer.

The bylaws of National Mutual were amended on November 30, 1951, and as amended provided, in part, as follows:

Section 8. For the purpose of voting at any annual meeting or adjournment thereof, each vehicle insured under the Company's automobile insurance policy shall constitute a separate risk or policy of insurance irrespective of whether or not the vehicles are all insured under a single policy, and qualifies the member or owner thereof to one vote for each vehicle insured. Said By-law may be amended or revoked hereafter only by a vote of a majority of the members as above defined at a regular annual meeting.

Section 9. In the event of either a voluntary or involuntary dissolution or liquidation of the Company, and there shall be a balance or surplus remaining over and above all determined liabilities and expenses (including liquidation expense and the re-payment of any and all surplus notes remaining unpaid), said

balance shall be paid to the policyholders in proportion to their premium or assessment earned and paid to the Company within one (1) year immediately preceding the date of the institution of such dissolution. Said By-law may be altered, amended or revoked only by a vote of the members, as hereinbefore specified in Section 8, and at a regular annual meeting of the membership.

For the surplus contribution notes totaling $12,000 which Peter theretofore had acquired, National Mutual on September 23, 1947, executed to Peter its 4-percent interest-bearing surplus contribution note in the amount of $12,000. On the same day and for an advance to it of $50,000 as a loan by Peter to finance its operations, National Mutual executed to him its 4-percent interest-bearing surplus contribution note for $50,000.

Although in 1947 and for several years thereafter National Mutual insured plate glass, its principal business after 1947 was insuring automobiles and taxicabs and Peter was its principal policyholder.

Following his acquisition of the charter of National Mutual, Peter insured his taxicabs with that company. For such insurance National Mutual set up the same premium rate, $30 per month, for each cab for the same amount of insurance—for bodily injury, $5,000 for one person, and $10,000 for more than one person, and $5,000 for property damage—as Peter theretofore had paid Michigan Mutual Automobile Insurance Company. Of the premium of $30 per month, $20 was for bodily injury insurance and $10 was for property damage insurance.

After carrying insurance on his cabs with National Mutual for about a year Peter discontinued it with that company as to his Radio Cabs because at that time neither he nor Frank Kennedy, an assistant to Peter in the operation of the cabs and from 1952 to 1957 manager and assistant secretary-treasurer of National Mutual, knew much about insurance and because at the end of the year it was necessary to submit to the Michigan insurance commissioner a lengthy report, the preparation of which was somewhat expensive. In lieu of obtaining insurance from National Mutual for the Radio Cabs, Peter posted a liability bond in the amount of $50,000 with the City of Detroit. After having operated 2 years under that arrangement and upon being informed that the applicable Internal Revenue Code did not permit him to deduct in his income tax returns reserves set up for unpaid claims, he then in 1951 insured his cabs with National Mutual.

In 1951 Kennedy and Warren Barth, who was experienced in insurance matters, analyzed the premiums and losses of National Mutual subsequent to the time Peter had acquired its charter and also the losses with respect to the Radio Cabs during the 2-year period when they were operated under the bond Peter filed with the City of Detroit. In connection with their analysis of the foregoing they considered the manual rates promulgated by the National Bureau of

Casualty and Surety Underwriters for stock insurance companies and manual rates promulgated by the Mutual Insurance Rating Institute for mutual insurance companies for the insurance on taxicabs in the City of Detroit. On the basis of the foregoing they concluded that in order to prevent National Mutual from operating at a loss, its premium rates for insurance on taxicabs should be adjusted. Thereafter and at an adjourned annual meeting of the members of National Mutual held on March 6, 1951, a motion was adopted that the taxicab rates be adjusted and ratified by the board of directors and be submitted to the Michigan insurance commissioner for approval. The following proposed premium rates were submitted to and approved by the insurance commissioner and were put into effect by National Mutual:

| Territory | Then current premium rates per month for— | | Proposed increased premium rates per month for— | |
|---|---|---|---|---|
| | Bodily injury $5,000/$10,000 | Property damage $5,000 | Bodily injury $5,000/$10,000 | Property damage $5,000 |
| Detroit | $20.00 | $10.00 | $29 | $10 |
| Pontiac | 16.50 | 8.50 | 29 | 10 |
| Jackson | 10.50 | 5.50 | 17 | 10 |
| Dearborn | 20.00 | 10.00 | 17 | 10 |
| Bay City [1] | 19.50 | 8.50 | 25 | 10 |

[1] Bodily injury coverage $20,000/$40,000.

In the spring of 1953 and following the filing of some large claims for bodily injuries occasioned in 1951 by some Radio taxicabs and in view of the increasingly larger amounts of judgments being rendered in automobile bodily injury cases, the firm of attorneys who represented National Mutual and handled the claims and suits filed against it for bodily injury and property damage recommended that the insurance for bodily injury on Peter's Radio Cabs be increased to $20,000 for one person and $40,000 for one accident with the insurance to remain at $5,000 for property damage. Kennedy and Barth, adopting a percentage rate used by stock and mutual casualty companies for increasing bodily injury coverage from $5,000/$10,000 to $20,000/$40,000, proposed an increase of 50 percent in the premium rate then paid for $5,000/$10,000, or an increase of $14.50 per month, or a total monthly premium of $53.50. The proposed increase was approved by the Michigan insurance commissioner and in July 1953 was put into effect by National Mutual. Thereafter and through 1957 Peter's cabs were insured for the higher coverage and at the increased premium rate. With the exception of cabs operated in Bay City, National Mutual had written no $20,000/$40,000 coverage prior to July 1953. At the annual meeting of the members of National Mu-

tual on January 16, 1954, Kennedy reported that the company had been authorized to carry insurance in the amounts of $20,000/$40,000 limits, that such new limits had been placed in effect in July 1953 and that such coverage would bring in additional revenue of $43,000 per year.

The premium rates for taxicab insurance which were put into effect by National Mutual in 1951 and 1953 were lower than the premiums usually charged by other insurers for like coverage.

During 1953 through 1957 National Mutual made a number of attempts to obtain reinsurance or excess insurance but none of the insurers approached were interested enough to seriously consider accepting such insurance.

Until an insurance company can prove that it has a surplus of at least $200,000 the Michigan commissioner of insurance will not authorize it to issue nonassessable contracts. All insurance policies issued by National Mutual during 1953 through 1957 were assessable and contained the following provision: "The contingent mutual liability of the named assured shall not exceed the amount of the premium specified in the declarations," which were part of the policies.

Prior to October 1955 the State of Michigan and the City of Detroit required minimum insurance coverage of $5,000/$10,000 for bodily injury and $5,000 for property damage as a prerequisite to the operation of a taxicab. Since October 1955 the required minimum coverage has been $10,000/$20,000 for bodily injury and $5,000 property damage.

In addition to insuring Radio Cabs and other taxicabs owned by Peter, National Mutual also insured cabs owned by Theodore Corporation and Radio Cabs owned by Chilton Mullikin and Teddy Theodore. Further, National Mutual also insured private automobiles. Substantially all the insurance on private automobiles was for fire and theft coverage for employees, associates, or relatives of Peter and employees of Theodore Corporation and National Mutual.

The following is a statement of the total number of vehicles insured by National Mutual during the indicated years and the portions of such totals owned by the indicated owners:

| Year | Total vehicles insured | Owned by Peter Theodore individually or by corporations wholly owned by him | Owned by Theodore Corporation | Radio Cabs owned by Chilton Mullikin and Teddy Theodore | Owned by others |
|---|---|---|---|---|---|
| 1953 | 293 | 254 | 20 | 3 | 16 |
| 1954 | 334 | 288 | 20 | 3 | 23 |
| 1955 | 317 | 281 | 15 | 3 | 18 |
| 1957 | 272 | 211 | 15 | 20 | 26 |

The following is a statement of the total premiums received by National Mutual during the indicated years for insurance on the vehicles shown in the preceding paragraph as "Owned by others":

1953 _____ $1, 358. 57
1954 _____ 404. 95
1955 _____ 251. 90
1956 _____ 205. 00
1957 _____ 221. 94

During the following years Theodore Corporation made payments of the indicated amounts directly to National Mutual in the form of insurance premiums or to Peter in the form of rents:

| Year | Amounts |
|---|---|
| 1952 _____ | $88, 797. 96 |
| 1953 _____ | 107, 723. 12 |
| 1954 _____ | 122, 681. 50 |
| 1955 _____ | 125, 202. 00 |
| 1957 _____ | 114, 438. 00 |

The following is a statement of the total net insurance premiums received by National Mutual during the indicated years, net losses paid by it, claims adjustment expenses paid, and yearend reserves:

| Year | Net premiums written | Net losses paid | Adjustment expenses paid | Yearend reserves |
|---|---|---|---|---|
| 1947 | $7, 976. 84 | $5, 536. 64 | _____ | $8, 660. 51 |
| 1948 | 87, 010. 95 | 30, 384. 25 | $11, 454. 35 | 23, 772. 97 |
| 1949 | [1] 24, 322. 72 | 15, 396. 06 | 5, 021. 11 | 16, 719. 58 |
| 1950 | [1] 34, 170. 03 | 25, 548. 27 | 6, 131. 20 | 23, 474. 18 |
| 1951 | 108, 478. 79 | 42, 430. 03 | 21, 987. 24 | 48, 738. 86 |
| 1952 | 116, 528. 39 | 56, 024. 07 | 21, 167. 79 | 50, 169. 22 |
| 1953 | 141, 970. 35 | 69, 314. 32 | 24, 981. 31 | 56, 503. 51 |
| 1954 | 162, 304. 25 | 54, 320. 79 | 18, 787. 99 | 110, 251. 05 |
| 1955 | 167, 426. 45 | 72, 318. 95 | 22, 086. 85 | 113, 318. 94 |
| 1956 | 166, 554. 30 | 72, 648. 15 | 25, 680. 23 | 110, 122. 86 |
| 1957 | 158, 643. 09 | 94, 606. 38 | 26, 616. 21 | 98, 263. 96 |

[1] The decrease in "premiums" was caused by the withdrawal of coverage on Radio Cabs in the City of Detroit.

National Mutual's net income from underwriting and investments and other income was as follows for the indicated years:

| Year | Underwriting | Investments | Other | Total |
|---|---|---|---|---|
| 1952 | $31, 165. 48 | $2, 708. 33 | _____ | $33, 873. 81 |
| 1953 | 35, 032. 05 | 3, 901. 67 | $100. 00 | 39, 033. 72 |
| 1954 | 26, 870. 28 | 4, 225. 00 | 4. 50 | 31, 099. 78 |
| 1955 | 74, 449. 94 | 5, 924. 25 | 136. 31 | 80, 510. 80 |
| 1956 | 55, 152. 98 | 8, 020. 47 | _____ | 63, 173. 45 |
| 1957 | 35, 679. 39 | 7, 600. 95 | 86. 55 | 43, 366. 89 |

Including the advance of $50,000 made by Peter to National Mutual during 1947 for which he received a surplus contribution note and including the advances totaling $12,000 made prior thereto by others and the surplus contribution notes which were acquired by Peter in

1947 and for which notes he acquired from the company a surplus contribution note in like amount, the surplus of National Mutual, due to losses sustained in 1947 and prior thereto, was $47,199.27 on December 31, 1947.

National Mutual's surplus at the end of the years 1948 through 1952 was as follows:

| | |
|---|---|
| 1948 | $68, 611. 09 |
| 1949 | 76, 021. 75 |
| 1950 | 71, 615. 88 |
| 1951 | 86, 331. 92 |
| 1952 | 119, 422. 98 |

During 1953 and with the approval of the commissioner of insurance, National Mutual repaid Peter the advance of $50,000 he made to it in 1947 and for which National Mutual had issued to him a surplus contribution note in like amount. In 1954 and with the approval of the commissioner of insurance, National Mutual paid Peter the amount of the surplus contribution note, $12,000, which it had issued to him in 1947. Although the $50,000 and the $12,000 notes issued by National Mutual to Peter were interest bearing, he waived the interest thereon. At a meeting on December 27, 1956, the directors of National Mutual declared a dividend amounting to $66,621.72 or an amount equal to 40 percent of the total net premiums received during 1956, and payable December 29, 1956, to policyholders of record on September 15, 1956. Pursuant thereto and thereafter in 1956, a dividend distribution of $66,621.72 was made to policyholders. Giving effect to the foregoing in the respective years the surplus of National Mutual at the end of the years 1953 through 1957 was as follows:

| | |
|---|---|
| 1953 | $107, 010. 56 |
| 1954 | 124, 165. 93 |
| 1955 | 190, 997. 80 |
| 1956 | 194, 078. 83 |
| 1957 | 233, 940. 85 |

The following is a statement of the total amount of claims involved in pending suits at the end of the indicated years and the range in the amounts of the claims:

| Year | Total amount of claims in suit | Claims ranged in amounts | |
|---|---|---|---|
| | | From— | To— |
| 1953 | $733, 000 | $10, 000 | $170, 000 |
| 1954 | 1, 200, 000 | 2, 000 | 200, 000 |
| 1955 | 1, 398, 000 | 3, 000 | 200, 000 |
| 1956 | 1, 170, 000 | 10, 000 | 170, 000 |
| 1957 | 1, 485, 000 | 3, 000 | 400, 000 |

During the years in issue the surplus of National Mutual was inadequate for the amount of the liability to which the company was

exposed as a result of its insurance of the taxicabs here involved. As a consequence the company did not accumulate and retain an unnecessarily large surplus.

All judgments resulting from the operation by Theodore Corporation of taxicabs owned by Peter which were in excess of the insurance coverage were paid by Theodore Corporation. Casualty losses incurred and paid during the period 1949 through 1958 by Theodore Corporation in excess of the limits of insurance coverage were paid on the following dates and in the indicated amounts:

| | |
|---|---|
| Apr. 28, 1953 | $12, 500 |
| June 10, 1953 | 5, 000 |
| Dec. 16, 1955 | 9, 000 |

National Mutual filed its income tax returns for its taxable years here involved on Form 1120 M, "For Mutual Insurance Companies Other Than Life or Marine Insurance Companies or Fire Insurance Companies Issuing Perpetual Policies" on which taxable income and tax thereon were reported as follows:

| Year | Taxable income | Tax |
|---|---|---|
| 1953 | $3, 526. 67 | $1, 417. 44 |
| 1954 | 3, 756. 25 | 1, 665. 29 |
| 1955 | 5, 293. 50 | 1, 733. 76 |
| 1957 | 5, 224. 75 | 1, 645. 93 |

In determining the deficiencies in tax against National Mutual here in controversy the respondent determined that it was not taxable as a mutual insurance company but as an insurance company other than life or mutual for the years 1953 through 1955 because for the period 1947 through 1955 it did not return to policyholders any amount of excess premiums over the cost of insurance, and for the year 1957 because for the period 1947 through 1957 it refunded only $66,621.72 to its policyholders although premium and investment income during that period exceeded actual costs of insurance by over $300,000.

The respondent further determined National Mutual's net income from underwriting and investments and taxable net income and deficiencies for the indicated years as follows:

| Year | Net income from underwriting | Net income from investments | Taxable net income | Deficiency |
|---|---|---|---|---|
| 1953 | $35, 032. 05 | $3, 901. 67 | $38, 915. 02 | $17, 492. 83 |
| 1954 | 26, 870. 28 | 4, 225. 00 | 31, 095. 28 | 9, 004. 26 |
| 1955 | 74, 449. 94 | 5, 924. 25 | 80, 358. 04 | 34, 552. 42 |
| 1957 | 35, 679. 39 | 7, 600. 95 | 41, 629. 39 | 14, 501. 35 |

In determining the deficiencies in tax against Peter here in controversy the respondent determined that Peter, by reason of the payments made to National Mutual as insurance on his taxicabs and

service cars, improperly diverted income from himself to National Mutual. Accordingly the respondent allocated to Peter as net income of National Mutual the following amounts for the indicated years and determined that such amounts were taxable to Peter for those years:

| | |
|---|---|
| 1953 | $34,943.33 |
| 1954 | 40,583.08 |
| 1955 | 40,657.73 |
| 1957 | 40,633.50 |

As an alternative to the foregoing determination, the respondent determined that of the amounts of $98,412.50, $114,296, $114,438, and $114,438 paid in 1953, 1954, 1955, and 1957, respectively, to National Mutual for insurance on taxicabs and service cars owned by Peter which he claimed or received the benefit of as business deductions in his income tax returns for such years, tne respective amounts of $20,441.04, $52,780.62, $41,217.61, and $5,487.55 were excessive and did not constitute allowable deductions as ordinary and necessary business expenses.

In determining the deficiencies in tax against Theodore Corporation for 1953 and 1955 here in controversy, the respondent determined that the corporation, by reason of the payments made to National Mutual as insurance on taxicabs and service cars, improperly diverted income from itself to National Mutual. Accordingly the respondent allocated to the corporation as net income of National Mutual the following amounts for the indicated years and determined that such amounts were taxable to the corporation for those years:

| | |
|---|---|
| 1953 | $3,305.92 |
| 1955 | 3,821.97 |

As an alternative to the foregoing determination, the respondent determined that of the amounts of $9,310.62 and $10,764 paid by Theodore Corporation in 1953 and 1955, respectively, to National Mutual for insurance on taxicabs and service cars owned by Theodore Corporation which it claimed as business deductions in its income tax returns for such years, the respective amounts of $7,574.76 and $7,270.47 were excessive and did not constitute allowable deductions as ordinary and necessary business expenses. In determining the deficiency in tax against Theodore Corporation for 1957, the respondent determined, but not in the alternative, that of the amount of $11,190 paid by the corporation in that year to National Mutual for insurance on taxicabs and service cars owned by the corporation and claimed as a business expense deduction by the corporation in its income tax return for the year, the amount of $7,572.71 was excessive and did not constitute an allowable deduction as an ordinary and necessary business expense.

During the middle thirties Peter acquired a lot on the corner of Woodward Avenue and Erskine in the City of Detroit. Shortly afterwards a building was constructed on the lot and the property became

known as 3150 Woodward Avenue. The building was constructed for a gasoline service station with small tanks outside and in front thereof. Subsequently when a tank began to leak, a larger tank was substituted therefor and was placed alongside the existing building. Sometime prior to 1951 Theodore Corporation acquired the property at 3150 Woodward Avenue and continued to own it through 1957.

Subsequent to acquiring the lot at 3150 Woodward Avenue, Peter purchased some lots adjacent thereto along Woodward Avenue which almost completely surrounded 3150 Woodward. Peter continued to own the adjacent lots through 1957.

About 1942 Peter purchased a vacant lot on Charlotte in the City of Detroit, erected a garage building thereon, and the property became known as 61 Charlotte. He rented an adjacent lot on which to park the cars that were to be repaired at the garage. About 1951 he purchased the vacant lot and continued to own it through 1957.

Although Theodore Corporation had used Peter's Woodward Avenue and Charlotte properties to service and maintain taxicabs, there were no written agreements between Peter and the corporation covering the use of the properties prior to December 1951.

On December 29, 1951, Peter executed three written leases whereby he leased to Theodore Corporation for a period of 5 years, beginning January 1, 1952, and ending December 31, 1956, his Woodward Avenue property and his two properties on Charlotte. As rental for the properties the leases provided that the corporation would pay him an amount equal to the allowable rate of depreciation on the improvements on the properties, plus real estate taxes and any special assessments levied against the real estate, plus the cost of necessary maintenance and repairs. The lease contemplated that the rental could not be determined until the end of each year and would be payable when determined.

On January 1, 1953, a new lease was executed by Peter to Theodore Corporation which in effect canceled the three separate leases which had become effective on January 1, 1952. By the new lease Peter leased the three properties to the corporation—

for a term beginning the first day of January, 1953 and ending the 31st day of December, 1957, to be used and occupied only for the carrying on of a taxi cab business, including garage and repair facilities, automobile storage, servicing, communications and other activities incidental thereto.

The annual rental provided for in the lease was $7,500 payable annually on December 31. Respecting the making of changes, alterations, and additions, the instrument provided that the corporation—

may make such changes, alterations and additions to the buildings located upon the said premises as may be necessary or desirable in adapting said premises and buildings to use in the Lessee's taxi cab business; however, the Lessee shall pay to the Lessor as additional rent the amount of the increase in real estate

taxes because of such changes, alterations and additions to the buildings and premises; and such additions shall remain for the benefit of the Lessor on the termination of this lease or renewal thereof.

The lease did not contain a specific grant of an option to renew. However, it provided that in the event the corporation should hold over, after the expiration of the term demised, for a sufficient period of time to create a renewal of the lease by operation of law, then any renewal or future right of possession not evidenced by an instrument in writing executed and delivered by Peter shall be a tenancy from month to month and for no longer term. Pursuant to the terms of the lease the corporation thereafter during 1953 through 1957 occupied and used in its business the above-mentioned properties of Peter.

Of the ground used by Theodore Corporation in the conduct of its business in 1951 and thereafter through 1957, about one-fourth was owned by the corporation and the remainder was owned by Peter. During 1951 through 1953 and at its own cost, the corporation made additions to its building at 3150 Woodward Avenue which were erected in part on Peter's Woodward Avenue lots. During 1953 the corporation at its own cost erected on the Charlotte properties of Peter an addition to the garage then on the property. The foregoing additions were of masonry construction. During the period over which the additions were made Peter had received several offers to purchase his taxicabs and there was a possibility of the corporation moving to another location because of the expense of operating at its then location. The additions were made to serve immediate needs of Theodore Corporation. In making the foregoing improvements on the above-named properties of Peter, the corporation during the indicated years expended the following amounts:

Woodward Avenue lots:

| | | |
|---|---|---|
| 1951 | { $13,900.00 | |
| | { 1,500.00 | |
| 1952 | 161.13 | |
| 1953 | 7,205.89 | $22,767.02 |
| Charlotte properties: | | |
| 1953 | 42,490.42 | 42,490.42 |
| Total | | 65,257.44 |

The record is silent as to the action taken by Peter and Theodore Corporation prior to or about December 31, 1957, respecting a renewal of the lease of January 1, 1953. However, there is no showing that upon the expiration of the lease on December 31, 1957, Peter thereupon took possession of the properties and the improvements thereon and that thenceforth the corporation did not occupy and use them.

In its income tax returns for the years 1953, 1955, and 1957 Theodore Corporation took deductions for depreciation of the improve-

ments made on Peter's Woodward Avenue and Charlotte properties computed on a life of 5 years, the term stated in the lease of January 1, 1953. In determining the deficiencies for the foregoing years the respondent determined that the adjusted cost of the improvements made on the Woodward Avenue lots in 1951 and 1952, $12,453.01, representing original cost of $15,561.53 less depreciation of $3,108.52 previously allowed for 1951 and 1952, should be depreciated from January 1, 1953, over a useful life of 30½ years. The respondent further determined that the cost of the improvements made in 1953 on the foregoing lots and on the Charlotte properties, $49,696.31, should be depreciated from July 1, 1953, over a useful life of 30 years.

In his income tax return for 1954, Peter took as a deduction for miscellaneous expense the amount of $500 which was explained in the return as travel and entertainment expense in connection with his positions as president of Theodore Corporation and Peter Theodore, Inc. In his return for 1955, Peter deducted as a miscellaneous expense the amount of $500 which was explained in the return as travel and entertainment expense in connection with his position as president of Theodore Corporation. No records were maintained by Peter of expenditures for such purposes and the foregoing amounts represent estimates. The respondent disallowed the deductions because of Peter's failure to submit evidence showing that the amounts thereof constituted ordinary and necessary business expenses of Peter.

Peter did not report as income in his returns for 1953 and 1954 the amounts of $50,000 and $12,000 received by him in the respective years from National Mutual in payment of the surplus contribution notes in the foregoing amounts which the latter had issued to Peter in 1947. The respondent determined that the foregoing amounts constituted taxable dividends to Peter for the respective years.

In his income tax return for 1955, Peter reported as income the amount of $199,862.07 received as taxicab rental. During that year Theodore Corporation paid him taxicab rental in the amount of $208,-028.55. The respondent increased the amount reported by Peter by the difference between the foregoing amounts, $8,166.48. From certain information he had received, the accountant who prepared Peter's return erroneously concluded that the $8,166.48 constituted a portion of the sales price of taxicabs Peter sold during 1955. Accordingly he erroneously included the amount in the sales price of the cabs in computing in Schedule D of Peter's return the long-term capital gain shown therein from the sale of cabs.

In determining the deficiency against Theodore Corporation for 1957, the respondent determined that $364.95 of the deduction of $380.50 taken by the corporation for contributions was not allowable.

OPINION.

Having determined that such action was necessary in order properly to reflect the net incomes of Peter and of Theodore Corporation, the respondent has allocated to Peter certain amounts of the net income of National Mutual for 1953, 1954, 1955, and 1957 and has allocated to Theodore Corporation certain amounts of National Mutual's net income for 1953 and 1955 and has determined that such income was taxable to them for the respective taxable years. In alternative to the foregoing, the respondent has determined that certain portions of the deductions taken by Peter for 1953, 1954, 1955, and 1957 and by Theodore Corporation for 1953 and 1955 for payments made in those years to National Mutual for insurance were excessive and did not constitute ordinary and necessary business expenses to Peter and Theodore Corporation, respectively. In addition, the respondent has determined, but not in the alternative, that a portion of the deduction taken by Theodore Corporation for 1957 for payment made in that year to National Mutual for insurance was excessive and did not constitute an ordinary and necessary business expense. Further, the respondent has determined that National Mutual was not taxable as a mutual insurance company for the years 1953, 1954, 1955, and 1957, but for such years was taxable as an insurance company other than life or mutual. In determining the deficiencies against National Mutual for the foregoing years, respondent did not eliminate from its net income the above-mentioned amounts, or any portion thereof, which he determined were taxable to Peter and Theodore Corporation.

The underlying question involved in the issues arising from all of the above-mentioned determinations of respondent is whether the amounts received by National Mutual for its issuance of insurance policies on taxicabs of Peter and Theodore Corporation were to any extent improperly paid to, received by, and retained by, it. Such being the question, we first will consider the correctness of the respondent's determination that National Mutual was not taxable as a mutual insurance company during the years in issue.

The position of the petitioners is that National Mutual was organized under the laws of Michigan as a mutual insurance company, that as such it has continued to operate to and through the taxable years in question, complying with the laws of that State and the rules and regulations of the Michigan insurance commissioner relating to it, and that on the factual situation presented it is entitled to classification as a mutual insurance company as contemplated by the Internal Revenue Codes of 1939 and 1954 and taxable as such. Although conceding that National Mutual during the years involved herein operated as a mutual insurance company, complying with the laws of Michigan and

the rules of the insurance commissioner of that State, the respondent takes the overall position that it failed to meet the prerequisites of a mutual company during the years in issue as contemplated by the Codes.

The Codes of 1939 and 1954 do not define a mutual insurance company. However, among the characteristics of such an organization are the common equitable ownership of the assets by the members which may at their option be transferred into legal title and reduced to possession by the dissolution of the company; the right of all policyholders to be members to the exclusion of other persons and to choose the management; the conduct of the business to the sole end that the cost of the insurance be reduced; and the right of the members to a return of the premiums paid in excess of the amounts necessary to cover losses and expenses. *Estate of Clarence L. Moyer*, 32 T.C. 515, 528 (1959); *Holyoke Mutual Fire Insurance Co.*, 28 T.C. 112 (1957); *Mutual Fire, Marine & Inland Insurance Co.*, 8 T.C. 1212 (1947). A mutual insurance company acting in good faith may properly retain from its earnings an amount sufficient to secure its policyholders in the future as well as at present and to cover any contingencies that may arise or may be fairly anticipated. *Order of Railway Employees*, 2 T.C. 607 (1943), appeal dismissed 143 F. 2d 597 (C.A. 9, 1944). Also the use of high premium rates would enable a company to make returns of premiums, while the use of low rates might make this impracticable, in either case the insurance being furnished at cost. *Mutual Fire, Marine & Inland Insurance Co., supra*. In *Order of Railway Employees, supra*, it was pointed out that there is no specific time fixed by the revenue law or indicated by court decisions within which excess premiums must be returned. There it was said:

The members, and they alone, are entitled to all dividends, whether resulting from current operations or paid upon dissolution and whether they are true dividends or only excess premiums paid.

The foregoing principle was reaffirmed in *Property Owners Mutual Insurance Co.*, 28 T.C. 1007, 1017 (1957).

The respondent's principal contentions in support of his position that National Mutual failed to meet the prerequisites of a mutual insurance company are that the company lacked mutuality because of Peter's control; that the company increased premium rates on taxicabs in 1951 and in 1953 by greater amounts than was proper thereby failing to provide insurance on the cabs substantially at cost; and that the company accumulated and retained an unnecessarily large surplus which resulted in its failure to provide insurance on the cabs substantially at cost.

The bylaws of National Mutual in effect during the years in issue provided that each vehicle insured by the company qualified the member-owner thereof to one vote and further provided that in the event

of dissolution or liquidation, any balance or surplus remaining over and above all determined liabilities and expenses, including liquidation expenses and the repayment of surplus contribution notes, should be distributed to policyholders in proportion to their premium or assessment earned and paid to the company within 1 year immediately preceding the date of the institution of such dissolution. By reason of the foregoing provisions of the bylaws and by reason of the large number of cabs insured, Peter held the following approximate percentages of the voting rights in the company on the indicated dates and in the event of liquidation of the company, on such dates his percentage of equitable ownership of the assets of the company would have been as follows:

| Date | Percentage of voting rights | Percentage of equitable ownership |
|---|---|---|
| Dec. 31, 1953 | 87 | 90 |
| Dec. 31, 1954 | 87 | 91 |
| Dec. 31, 1955 | 89 | 93 |
| Dec. 31, 1957 | 74 | 86 |

The respondent urges that the foregoing percentages were such as to warrant the conclusion that the company lacked mutuality. Although during all of the years in question Peter was in control of the company by reason of his voting rights therein, which arose from the large number of his vehicles which were insured in the company, and he equitably owned large percentages of the assets of the company as a result of the large amounts of premiums paid to the company for insurance on his cabs, it is to be observed that substantial portions of the total voting rights were held by the other members of the company and that substantial portions of the assets of the company were equitably owned by those members. Further, in *Citizens Fund Mutual Fire Insurance Co.*, 28 T.C. 1017 (1957), the taxpayer's articles of incorporation or its bylaws provided that every policyholder should be a member, that every policyholder should be entitled to one vote for each policy of insurance in force, that every policyholder should be entitled to a pro rata share of the dividends, and that on dissolution the sum remaining after the payment of losses, debts, and liabilities should be distributed pro rata to policyholders at the time of such dissolution. Under the law of the State of its incorporation the taxpayer was authorized to issue interest-bearing "guaranty fund certificates" for sums loaned to it. The taxpayer's articles of incorporation provided that the management of the taxpayer should be vested in a board of directors of not fewer than five nor more than nine directors who should be policyholders or holders of guaranty fund certificates. Each holder of a guaranty fund certificate was entitled to one vote at

any meeting of the members of the company for each $10 of the amount of the guaranty fund certificate or certificates held by him, and the certificate holders were entitled to elect from their members or from policyholders at least one-half of the total number of directors. Two policyholders of the taxpayer loaned $35,000 to it, received from it a guaranty fund certificate of a like amount, and thereupon became entitled to 3,500 votes in addition to those they were entitled to as policyholders. There it was held that the fact that by the loan the two policyholders obtained voting rights greatly in excess of what they as policyholders had and the fact that they also were entitled to receive repayment in full of the $35,000 either before or at the time of liquidation and prior to receipt of anything in liquidation by the other policyholders did not prevent the taxpayer from being a mutual insurance company and taxable as such. In view of that holding and since Peter's preponderance of voting rights in National Mutual arose from the number of his vehicles which were insured in that company and his preponderant equitable ownership in the assets of the company arose from the amount of premiums paid to the company for insurance on those vehicles, we are of the opinion that such preponderances did not cause the company to be lacking in mutuality.

Prior to July 1953, Peter's taxicabs were insured by National Mutual for $5,000/$10,000 bodily injury and $5,000 property damage for a monthly premium of $39. In the spring of 1953 following the filing of some large claims for bodily injuries occasioned in 1951 by some Radio Cabs and in view of the increasingly larger amounts of judgments being rendered in automobile bodily injury cases, the firm of attorneys who represented National Mutual and handled the claims and suits filed against it for bodily injury and property damage recommended that the insurance on Peter's and Theodore Corporation's cabs for bodily injury be increased to $20,000/$40,000 bodily injury and remain at $5,000 for property damage. In July 1953, National Mutual with the approval of the Michigan insurance commissioner put the increased rate in effect and issued insurance on the cabs for the increased coverage for a monthly premium of $53.50. Thereafter, and throughout 1957, Peter's and Theodore Corporation's cabs were insured for the increased coverage and at the increased premium.

Respondent contends that Peter and Theodore Corporation unnecessarily and without any business purpose insured their cabs for the increased coverage because in 1953 the minimum coverage required by the State of Michigan and the City of Detroit was only $5,000/$10,000 bodily injury and $5,000 property damage and that such minimum requirement continued in effect until October 1955 when it was increased only to $10,000/$20,000 for bodily injury with $5,000 for property damage and that increased requirement continued in effect through the remainder of the taxable years in issue. The respondent has sub-

mitted evidence to the effect that Checker Cab Association, which operated in the Detroit area and whose membership was limited to taxicab operators owning not less than three nor more than six cabs, during 1953 and through October 1955 charged $27.50 monthly for insurance coverage of $5,000/$10,000 bodily injury and $5,000 property damage and after October 1955 charged $37.50 monthly for coverage of $10,000/$20,000 bodily injury and $5,000 property damage. The respondent also has submitted evidence to the effect that Lincoln Mutual Casualty Company during the taxable years in question insured taxicabs operating in Detroit; that during 1953 it charged $400 annually for insurance coverage of $5,000/$10,000 bodily injury and $5,000 property damage, and that during the years 1953, 1954, 1955, and 1957 it insured some Radio Cabs, not shown by whom owned, at the same rates it charged other cab owners. No showing is made as to the rates charged by Lincoln Mutual after the minimum coverage was raised by the State of Michigan and the City of Detroit in October 1955. The respondent urges that, on the basis of the foregoing, National Mutual's premium rates were higher than Peter and Theodore Corporation could have obtained the required coverage elsewhere.

Respecting the respondent's contention as to the increase in the amount of insurance coverage on the cabs in 1953, the respondent concedes that normally it is within the business discretion of the owner of a taxicab as to the amount of insurance coverage he will purchase thereon. However, he urges that the situation here is not a normal one because of Peter's and Theodore Corporation's control of National Mutual. So far as we can ascertain the coverage was increased in 1953 solely because of the recommendation of the firm of attorneys who represented National Mutual and whom Peter and the corporation were expecting to defend claims and suits resulting from accidents caused by the cabs. Under the circumstances presented it is our opinion that their action in following the recommendation was normal, in good faith, and for a business purpose. Relative to respondent's contention to the effect that the charges for insurance made by Checker Cab Association and Lincoln Mutual show that Peter and Theodore Corporation paid to National Mutual greater amounts for insurance than they could have obtained it elsewhere, it is observed that membership in Checker Cab Association was limited to owners of not less than three nor more than six cabs. By reason of that limitation and by reason of the fact that Peter and the corporation each owned considerably more than six cabs, they obviously were ineligible for membership in that association and its lower rate was not available to them. It is observed further that the evidence submitted by respondent as to the charges by Checker Cab and Lincoln Mutual for insurance fails to indicate what their charges were during the years

in issue for coverage of $20,000/$40,000 bodily injury and $5,000 property damage. Since that amount of coverage is the principal concern here, we think the failure of respondent's evidence in the foregoing respect is significant. Since the record contains other evidence to the effect that the premium rates for taxicab insurance which were put into effect by National Mutual in 1951 and 1953, the latter of which continued in effect through 1957, were lower than the premiums usually charged by other insurers for like coverage, we have found such to be the fact.

Respecting the respondent's contention that National Mutual accumulated and retained an unnecessarily large surplus during the years in issue, it is to be observed that from July 1953 through 1957 the company's contingent liability with respect to each cab insured amounted to $40,000 for bodily injury and $5,000 property damage or a total of $45,000. Multiplying that amount by 193 as representing the possible minimum number of cabs owned by Peter, Theodore Corporation, Mullikin, and Teddy Theodore and insured by the company during the respective years on which the company's liability was $45,000 gives a total liability of approximately $8,700,000. Giving effect to the repayment by the company in 1953 and 1954 of its surplus contribution notes, totaling $62,000, and its payment of a dividend of $62,621.72, the company's surplus ranged from a low of approximately $107,000 at the end of 1953 to a high of approximately $233,941 at the end of 1957.

At the trial the assistant chief examiner of the Michigan Department of Insurance, who has been an examiner for the department since 1941 and who was the examiner in charge of examination of National Mutual made by that department for the years 1954 through 1959, appeared as a witness for the petitioners. Among other things, he testified as to his opinion of the inadequacy of the reserves of the company. Relying on testimony of the witness given on cross-examination, the respondent has requested that we find the following as a fact:

The surplus of National Mutual from the time it was acquired by Peter Theodore [in 1947] through 1957 was inadequate. The surplus was inadequate for the number of cabs that were subject to exposure on the streets.

From a consideration of the testimony of the above-referred to witness, together with the remainder of the record bearing on the matter, we have concluded and found as a fact that during the years in issue the surplus of National Mutual was inadequate for the amount of liability to which the company was exposed as a result of its insurance of the taxicabs here involved. In view of that finding and since the surplus of a mutual insurance company forms a reserve for the

protection of its members against extraordinary losses, we are unable to find, as the respondent contends, that for the years in question National Mutual accumulated and retained a surplus that was unnecessarily large.

In view of what has been said above, we hold that National Mutual during the years in issue was a mutual insurance company and was taxable as such. The petitioners are sustained as to this issue.

The pleadings present (1) certain issues relating to the respondent's allocation to Peter of certain portions of the net income of National Mutual for the years 1953, 1954, 1955, and 1957 and his determination that Peter was taxable thereon for such years; (2) certain issues relating to the respondent's allocation to Theodore Corporation of certain portions of income of National Mutual for 1953 and 1955 and his determination that Theodore Corporation was taxable thereon for such years; and (3) certain issues relating to respondent's alternative determinations that portions of deductions taken by Peter for 1953, 1954, 1955, and 1957 and certain portions of the deductions taken by the corporation for 1953 and 1955 and respondent's further determination, not made in the alternative, that a portion of the deduction taken by the corporation for 1957, all of which deductions were taken for payments made during the indicated years to National Mutual for insurance, were excessive and did not constitute ordinary and necessary business expenses.

With respect to the issues relating to respondent's allocations of the net income of National Mutual to Peter and Theodore Corporation and his determination that they were taxable thereon, the petitioners contend that such action was not warranted under the circumstances presented. The respondent's overall contention in substance is that the arrangements under which Peter's fleet of taxicabs was operated in Detroit by Theodore Corporation during the years in issue and insurance on the cabs was issued by National Mutual were merely a means of diverting from Peter and Theodore Corporation the income arising from the operation of the cabs and under the guise of payments for insurance on the cabs channeling such income to National Mutual which paid no tax thereon and that the arrangements were designed for the avoidance of tax by Peter and Theodore Corporation. Since we have held that National Mutual was a mutual insurance company during the years in issue and taxable as such and since the premium rates charged by it during the years in issue for the taxicabs were lower than those usually charged by other insurers for like coverage and since its surplus during the years in issue was inadequate for the liability to which it was exposed as a result of the insurance issued by it on the taxicabs, the respondent's contention is not well

grounded. As a consequence the respondent is not sustained as to the foregoing issues.

Because of the foregoing factual situation we are unable to sustain the respondent's determinations that portions of the deductions taken by Peter and Theodore Corporation for payments made to National Mutual for insurance were excessive and did not constitute ordinary and necessary business expenses.

Although Theodore Corporation had used Peter's Woodward Avenue and Charlotte properties in its business, there were no written agreements between them covering the use of the properties prior to December 29, 1951. On that date, Peter executed three separate written leases whereby he leased the properties to the corporation for a period of 5 years, beginning January 1, 1952, and ending December 31, 1956. These leases did not grant the corporation permission to construct improvements on the properties or any options for renewal. On January 1, 1953, a new lease was executed by Peter to the corporation which in effect canceled the three leases which had become effective on January 1, 1952. By the lease of January 1, 1953, Peter leased the properties to the corporation for a term of 5 years, beginning January 1, 1953, and ending December 31, 1957. The lease granted the corporation permission to make improvements on the properties during the term of the lease and provided that such improvements should remain for the benefit of Peter on the termination of the lease or renewal thereof. The lease did not contain a specific grant of an option for renewal thereof. During 1951 and 1952 the corporation made certain expenditures for improvements on the Woodward Avenue property. In 1953 the corporation made certain expenditures for improvements on both properties. The respondent determined and here contends that the adjusted cost of the improvements made in 1951 and 1952 should be depreciated over a useful life for the improvements of 30½ years from January 1, 1953, and that the cost of the improvements made in 1953 should be depreciated over a useful life for those improvements of 30 years from July 1, 1953. The petitioners contend that in the situation presented and since the term of the lease of January 1, 1953, was 5 years, the respondent erred in determining that the costs in question should be depreciated over a longer period.

Pointing out that prior to 1951 Theodore Corporation occupied and used the properties of Peter without entering into any written lease or leases thereon, that Peter was a stockholder and president of the corporation and closely related to the other stockholders, and that substantial amounts were expended by the corporation in making improvements on Peter's properties during 1951, 1952, and 1953, the respondent urges that we should carefully consider the situation pre-

sented and conclude that during the periods in which the corporation made expenditures for improvements to the properties, there was a reasonable probability that the corporation could continue to occupy and use the properties indefinitely regardless of the 5-year term stated in the lease of January 1, 1953, and that since the tenancy of the corporation was for an indefinite period, the allowance for depreciation of the cost of the improvements should be based on the life of the improvements. It is true that the term of the lease of January 1, 1953, as stated therein, was for a period of 5 years ending December 31, 1957, and that the lease contained no specific grant of an option for renewal. However, that portion of the lease granting Theodore Corporation the right to make improvements on the leased properties recites that such improvements "shall remain for the benefit of the Lessor [Peter] on the termination of this lease or renewal thereof." In our view such language indicates that the lease contemplated a renewal thereof. Whether the renewal should be for a like, longer, shorter, or indefinite term was not stated but was left as an open matter for later determination.

At the time of the execution of the lease Peter was president of the corporation and owned 11.5 percent of its stock. Cyril Theodore and Teddy Theodore were the other officers of the corporation and owned the remaining 88.5 percent of its stock. Peter executed the lease as lessor and as president of the corporation also executed it for the corporation as lessee. At the time of the trial Cyril was dead and Teddy did not appear as a witness at the trial. Although Peter appeared at the trial as a witness for the petitioners, he was not asked to give nor did he give any testimony indicating what his intention or that of the other stockholders of the corporation was with respect to the future tenancy by the corporation of the leased properties at the times the improvements in question were made thereon or at the time the lease of January 1, 1953, was executed. Paul Huffman, who from January 1951 to January 1961 was employed by the corporation as its auditor and in charge of all its records, appeared as a witness for the petitioners and testified to the effect that the improvements on Peter's Woodward Avenue property were made with "no thought of the future." Aside from the fact that he was capable of speaking only with respect to himself, such testimony, standing unexplained as it is in the record, is of little aid to petitioners.

From our consideration of the record we think it is hardly probable that Cyril and Teddy Theodore as owners of 88.5 percent of the stock of Theodore Corporation would have concurred in the expenditure of the substantial sums expended by the corporation in making the improvements on Peter's properties unless it was intended and they were

assured that the occupancy and use by the corporation of the improvements would extend beyond December 31, 1957. In view of the foregoing and since there is no showing that upon the expiration on December 31, 1957, of the lease of January 1, 1953, Peter thereupon took possession of the properties and that thenceforth the corporation did not occupy and use them, we are of the opinion that in substance, if not in form, the lease of January 1, 1953, was one wherein the corporation's occupancy thereunder began and continued with the purpose and assurance that such occupancy would be continued for an indefinite period.

As was stated in *Standard Tube Co.*, 6 T.C. 950, 955 (1946), "where the tenancy of the lessee is for an indefinite period the allowance for exhaustion of the cost of improvements should be based upon the life of the improvements." In view of the foregoing and since we are unable to find that the lives of the improvements were other than those used by the respondent in determining the exhaustion allowances involved here, we sustain his determination as to this issue.

Although having maintained no records therefor and as a result being without any, Peter estimated that during 1954 he expended $500 as travel and entertainment expense incurred by him in connection with his positions as president of Theodore Corporation and Peter Theodore, Inc. Similarly he estimated that during 1955 he expended $500 for like purposes incurred in connection with his position as president of Theodore Corporation. The amount estimated for each year was deducted in his income tax return for that year and was disallowed by respondent because of Peter's failure to submit evidence showing that such amounts were ordinary and necessary business expenses of Peter. The evidence submitted by petitioners on this issue not only fails to afford any substantial basis for an approximation of the amounts expended but also fails to show any arrangement between Peter and the corporations whereby under his employment as president he was required to bear the cost of his travel and entertainment incurred in their behalf. For lack of evidence to show error the respondent is sustained on this issue.

The respondent determined that the amounts of $50,000 and $12,000 received by Peter from National Mutual in 1953 and 1954, respectively, in payment of the surplus contribution notes issued by it to him in 1947 constituted taxable dividends to Peter for the respective years. The notes represented indebtedness of National Mutual arising from sums advanced to it as loans and were repayable only from surplus of the company and with the approval of the Michigan insurance commissioner. Since the payments in question were repayments of loans,

they were not dividends and therefore were not taxable income to Peter.

During 1955 Theodore Corporation paid Peter taxicab rental in the amount of $208,028.55. Of that amount, $199,862.07 was reported in Peter's income tax return for that year as taxicab rental and the remainder, $8,166.48, as the result of an erroneous conclusion reached by the accountant who prepared the return from information he had received, was included in the sales price of certain taxicabs sold by Peter during the year and from the sale of which long-term capital gain was reported in Peter's return. Since the $8,166.48 constituted taxicab rental, it was taxable as rent and not as long-term capital gain.

The respondent determined that during 1954, 1955, and 1957 Peter received unreported interest income in the amounts of $383.69, $915.03, and $824, respectively, and increased his taxable income accordingly. The evidence of the petitioners establishes, and the petitioners concede on brief, the correctness of the foregoing action of the respondent.

In determining the deficiency against Theodore Corporation for 1957 the respondent disallowed $364.95 of a deduction of $380.50 taken by the corporation for that year for contributions. In its petition involving that year the corporation assigned error as to the respondent's disallowance which was denied by respondent in his answer. The petitioners have not submitted any evidence in support of the assignment of error nor have they made any contention with respect thereto on brief. In this situation we assume the petitioners have abandoned the issue and accordingly sustain the respondent.

In its petition involving the years 1953, 1954, and 1955 National Mutual assigned error as to the respondent's action in determining that the deficiencies determined against it for those years were not barred by the expiration of the applicable statutory periods of limitations. In his answer the respondent denied the assignment of error, affirmatively alleged that assessment of the deficiencies was not barred by the expiration of the applicable statutory periods of limitations and alleged further facts respecting the dates of filing of the returns for such years and respecting the execution of consents extending the periods of limitations. By stipulation the parties placed in evidence copies of National Mutual's income tax returns for the foregoing years to which were attached copies of consents as alleged by respondent. Since no other evidence was submitted with respect to the issue and the petitioners have made no contention with respect thereto on brief, we assume they have abandoned the issue. Accordingly we sustain the respondent.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*