T.C. Memo. 2001-201

UNITED STATES TAX COURT

JEFFREY TAMMS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8130-99.                    Filed August 1, 2001.

<u>Bela Roongta Eitel</u> and <u>Michael J. Cohn</u>, for petitioner.

<u>J. Paul Knap</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1993 | $6,092 |
| 1994 | 6,883 |
| 1995 | 1,824 |

After concessions, the issues for decision are: (1) Whether petitioner conducted his photography-related activity during 1993 and 1994 with the intent to make a profit within the meaning of section 183, and (2) whether petitioner is entitled to deduct $8,291 in unreimbursed employee expenses for taxable year 1995.

All section references are to the Internal Revenue Code as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference. When he petitioned the Court, petitioner resided in Whitefish Bay, Wisconsin.

Since the mid-1970s, petitioner has been employed full time as a computer and accounting consultant. Since 1982, he has been employed in this capacity by Compuware Corp. (Compuware) or its predecessor in interest. Over the years, petitioner has developed a keen interest and expertise in photography, becoming a member of numerous professional photography organizations.

In 1982, petitioner formed JJT, Ltd. (JJT), a sole proprietorship that he operated out of his home, without any employees. Petitioner formed JJT to provide support services to Professional Services, Inc. (PSI), a corporation that was in the business of selling foundry supplies and sand-blasting equipment.

Petitioner's father, Kenneth Alvin Tamms (Mr. Tamms), was president and a nonmajority shareholder of PSI.[1]  Because of ill health, Mr. Tamms stopped working at PSI in October 1992. Thereafter, petitioner operated PSI until its complete liquidation in 1995.

Beginning in 1982 and continuing until PSI's liquidation in 1995, PSI retained JJT to:  (1) Provide back office support (e.g., computerizing and processing accounts receivable and payable), and (2) photograph and provide graphic representations of PSI's equipment for sales and to ensure PSI's compliance with OSHA regulations in operating the equipment.  From January 1993 through April 1995, JJT billed PSI $505 per month for its services.  In May 1995, JJT reduced its monthly fee to $205 because PSI was in the process of closing the business and no longer required the full range of JJT's services.  Petitioner never realized a net profit from the service arrangement with PSI.

In 1988, realizing that his father was aging and that PSI's business was in decline, petitioner sought to purchase a wedding photography business, but, after a period of negotiations, the would-be seller decided not to sell.  Subsequently, petitioner began exploring the possibility of transitioning JJT into

---

[1] The record indicates that other members of petitioner's family were also shareholders of Professional Services, Inc., but does not otherwise reveal the ownership composition.

producing photography exhibitions as a means of earning revenue. To do so, he believed he needed to enhance his reputation as a photographer. To that end, by 1992 petitioner was spending 60 to 80 hours per month building his own photography portfolio. He began entering his works in exhibitions, winning numerous photography awards and achieving substantial acclaim.

In 1993, petitioner was asked to take over the production and management of an existing photography exhibition, the Wisconsin International Exhibition of Photography, and he also assisted the Wisconsin Area Camera Club Organization (WACCO) in producing an existing international photography exhibition.

In 1994, petitioner took over production of the exhibition for WACCO. In each of the years 1993, 1994, and 1995, petitioner produced one exhibition. Beginning in 1996 and continuing to the present, petitioner has produced four exhibitions each year, devoting approximately 800 to 1000 hours each year to this activity.

Petitioner's activities in producing photography exhibitions include, among other things, advertising the exhibition, drafting and printing brochures, compiling mailing lists, inviting photographers to participate, sending and receiving applications, recruiting judges, creating a catalog of entries, obtaining sponsors, purchasing awards, and performing marketing and accounting functions. These activities are a "year-round

process", commencing about a year before the opening of an exhibition with the assembly of documentation to request recognition by the Photographic Society of America and concluding about a year later with the production of a catalog and returning entries submitted.

JJT pays all the costs associated with the exhibitions it produces and is the sole recipient of the revenues generated. Beginning in 1994 and continuing to the present, petitioner has consistently realized modest net profits from producing the photography exhibitions. Petitioner has plans to increase JJT's revenues by increasing the number of exhibitions he produces each year and by increasing entry fees. In addition, petitioner has been involved in efforts by the Photographic Society of America to set standards for "electronic exhibitions", which he anticipates would reduce his operating costs for exhibitions and thus increase his net profits. Petitioner has also been asked to begin teaching photography to select groups, and he anticipates that such teaching opportunities will generate significant additional revenues. He also anticipates that he will continue to offer his prints for sale, although he does not expect the proceeds to be substantial.

On his Federal income tax returns, petitioner reported net losses from JJT's activities every year from the inception of JJT in 1982 until 1995, when JJT reported a small profit. Since

then, JJT has reported net profits every year, as summarized in this table:[2]

| Year | Receipts | Cost of Goods Sold | Expenses | Net Profit or Loss |
|------|----------|--------------------|----------|--------------------|
| 1988 | $7,566 | $5,149 | $4,091 | ($1,674) |
| 1989 | 4,250 | 6,141 | 1,649 | (3,540) |
| 1990 | 6,060 | 9,188 | 2,081 | (5,209) |
| 1991 | 6,135 | 5,801 | 6,621 | (6,287) |
| 1992 | 7,805 | 6,109 | 4,802 | (3,106) |
| 1993 | 6,060 | 5,677 | 9,389 | (9,006) |
| 1994 | 7,019 | 5,493 | 12,051 | (10,525) |
| 1995 | 7,124 | -0- | 7,016 | 108 |
| 1996 | 13,470 | -0- | 12,294 | 1,176 |
| 1997 | 14,426 | -0- | 13,200 | 1,226 |
| 1998 | 13,075 | -0- | 11,936 | 1,139 |

For the years in issue, JJT's gross revenues were attributable to PSI and other sources (principally photography exhibitions) as follows:

| Year | Gross Income from PSI | Gross Income from Other Sources |
|------|-----------------------|---------------------------------|
| 1993 | $6,060 | -- |
| 1994 | 6,060 | $959 |
| 1995 | 2,460 | 4,664 |

For taxable years 1996 through 1998, producing photography exhibitions was the sole source of revenue for JJT.

For the years in issue, petitioner claimed the following costs of goods sold and deductions on his Schedules C, Profit or Loss From Business (Sole Proprietorship) (Schedule C):

---

[2] The record does not indicate the amount of JJT's losses or other relevant tax information for years before 1988.

| Item | 1993 | 1994 | 1995 |
|------|------|------|------|
| Cost of goods sold | $5,677 | $5,493 | -- |
| Advertising | -- | -- | $928 |
| Car and truck | 150 | -- | -- |
| Commissions and fees | -- | -- | 130 |
| Depreciation | 5,278 | 5,657 | -- |
| Insurance | 601 | 582 | -- |
| Interest | 1,630 | 1,584 | 1,481 |
| Legal and professional | 56 | -- | -- |
| Office | -- | 899 | 1,840 |
| Rent or lease | -- | 200 | -- |
| Repairs and maintenance | 263 | 321 | 137 |
| Supplies | 719 | 824 | 993 |
| Taxes and licenses | 3 | 25 | -- |
| Travel | 477 | 1,770 | 520 |
| Utilities | 211 | 188 | 195 |
| Other | -- | -- | 792 |

In the notice of deficiency, respondent disallowed all of petitioner's claimed Schedule C costs of goods sold and deductions for expenses on the ground that petitioner was not engaged in the Schedule C activity for profit.

OPINION

Respondent's Motion In Limine

Respondent filed a motion in limine to exclude or limit the testimony of petitioner's proposed expert witness, Mark J. Spaeth (Mr. Spaeth). The Court permitted petitioner to make an offer of proof and reserved ruling on the admissibility of the evidence.

In large part, Mr. Spaeth's expert report and testimony reflect his legal opinion about the ultimate legal issue of

whether JJT was conducted for profit and to that extent do not help us "to understand the evidence or to determine a fact in issue" within the meaning of rule 702 of the Federal Rules of Evidence. Even if we were to grant respondent's motion in toto, however, we would find sufficient evidence elsewhere in the record to sustain petitioner's position that the subject activity was conducted for profit. Accordingly, we conclude that respondent's motion in limine is moot.

Activity Engaged in for Profit Under Section 183(c)

The parties disagree as to whether petitioner engaged in his Schedule C activity with an objective of making a profit within the meaning of section 183. The parties have stipulated that if petitioner did have the requisite profit objective, then the expenses, cost of goods sold, and receipts as stated in petitioner's Schedules C for the years in issue are "true and correct", with exceptions not pertinent here.[3]

Under section 183(b)(2), if an individual engages in an activity not for profit, deductions relating thereto are allowable only to the extent gross income derived from the activity exceeds deductions that would be allowable under section 183(b)(1) without regard to whether the activity constitutes a

---

[3] Moreover, respondent has raised no issue as to whether, in the event petitioner is found to have the requisite profit objective for his Schedule C activity, any of the expenses in question fail to constitute ordinary and necessary business expenses within the meaning of sec. 162(a).

for-profit activity.  <u>Allen v. Commissioner</u>, 72 T.C. 28, 32-33 (1979).

The taxpayer bears the burden of establishing that his or her activities were engaged in for profit.[4]  Rule 142(a).  To carry this burden, the taxpayer must show that he or she had a "good faith expectation of profit."  <u>Burger v. Commissioner</u>, 809 F.2d 355, 358 (7th Cir. 1987), affg. T.C. Memo. 1985-523; see <u>Dreicer v. Commissioner</u>, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983).  The taxpayer's expectation, however, need not be reasonable.  <u>Burger v. Commissioner</u>, <u>supra</u>; <u>Golanty v. Commissioner</u>, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.  Whether the taxpayer has the requisite profit motive is a question of fact, to be resolved on the basis of all relevant circumstances, with greater weight being given to objective factors than to mere statements of intent.  See <u>Dreicer v. Commissioner</u>, <u>supra</u>; <u>Golanty v. Commissioner</u>, <u>supra</u> at 426.

---

[4] Sec. 7491, which is effective for examinations commenced after July 22, 1998, shifts the burden of proof to the Commissioner under certain circumstances.  Petitioner has not raised the application of this provision.  Additionally, we cannot ascertain from the record whether respondent's examination commenced after July 22, 1998.  We therefore conclude that sec. 7491 does not operate to shift the bruden of proof in this case. See <u>Ashley v. Commissioner</u>, T.C. Memo. 2000-376; <u>Daya v. Commissioner</u>, T.C. Memo. 2000-360; <u>Nitschke v. Commissioner</u>, T.C. Memo. 2000-230.

The regulations under section 183 provide a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. The factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort the taxpayer expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the taxpayer's success in carrying on other activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the taxpayer's financial status; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs; see also Golanty v. Commissioner, supra.

On the basis of the totality of the evidence in the record, we conclude that for the years in issue, petitioner had a good faith expectation of profit from his Schedule C activity. In reaching this conclusion, we view the following factors as being particularly persuasive: Petitioner carried on his activity in a businesslike manner, keeping, as respondent acknowledges on brief, "fairly extensive financial records for his Schedule C activity." Petitioner responded to JJT's lack of profitability in earlier years by developing a successful business plan to expand JJT's undertakings into producing photography exhibitions.

Since 1994, petitioner has regularly produced photography exhibitions each year. As a consequence, since 1995 JJT has reported net profits each year. Petitioner has devoted a significant amount of time to his Schedule C activity, is a member of numerous professional photography associations, and has exhibited his photography in numerous exhibits, winning numerous awards and critical acclaim for his photographic works. Although petitioner enjoys photography, we do not believe that he was providing bookkeeping and photography services to PSI for amusement, nor do we believe that personal gratification was petitioner's primary motivation for producing multiple photography exhibitions each year.

On balance, we believe that the factors described above outweigh other factors that admittedly suggest the absence of a profit motive. Chief among these contrary factors is JJT's long history of losses during the 11 years preceding the years in issue, when the only source of revenues for JJT was the billings for its services to PSI--a factor given greater saliency by petitioner's family and personal ties to PSI.[5] As previously discussed, however, by 1993--the first year in issue--petitioner

---

[5] Respondent has not explicitly argued that JJT's dealings with PSI were not at arm's length. On brief, respondent alludes to a "degree of suspicion" that PSI's payments to petitioner were merely gifts but seemingly overcomes this suspicion two sentences later, stating: "It is not disputed that the Petitioner was hired to perform accounting, computer, and 'imaging' services for PSI."

had begun to implement a plan to improve JJT's profit-making potential by expanding its undertakings into the production of photography exhibits. By 1995--the last year in issue--petitioner was reporting small net profits from his Schedule C activities. In subsequent years, the net profits have increased.

Respondent argues that on the basis of the net profits that petitioner has reported for JJT since 1994, it will take an inordinately long while for petitioner to recoup JJT's past losses. We agree with respondent's premise that the requisite profit objective must be to "realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). We are unpersuaded, however, that petitioner's profitability will be constrained to the levels reported on his tax returns through 1998. To the contrary, petitioner testified credibly that he has a business plan to increase the number of exhibitions he produces each year and to decrease his costs, thus increasing his profits from exhibitions, as well as to earn additional revenues from teaching photography courses and from continuing to offer his prints for sale.

Seemingly acknowledging that petitioner's production of photography exhibitions is a for-profit undertaking, respondent

argues for the first time on brief, with little elaboration, that this undertaking was a "new and separate activity from what went before and not simply * * * an improvement or change to the old activity". Respondent relies on Pederson v. Commissioner, T.C. Memo. 1994-555, for the proposition that petitioner cannot support a profit motive in his photography activities by "combining that activity on the same Schedule C with a legitimate business activity."

Unlike Pederson, this is not a case where respondent determined petitioner's Schedule C activity to comprise separate and distinct activities, as opposed to raising the issue for the first time on brief. As a general rule, we will not consider issues raised for the first time on brief where surprise and prejudice are found to exist. See Sundstrand Corp. v. Commissioner, 96 T.C. 226, 346-347 (1991); Seligman v. Commissioner, 84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986). We believe that petitioner was surprised and prejudiced in the development of his evidence by respondent's posttrial contentions in this regard. In particular, if we were to find that petitioner's Schedule C activity comprised two or more separate activities, it would be necessary to allocate petitioner's expenses among the separate activities. See sec. 1.183-1(d)(2), Income Tax Regs. By not being forewarned of respondent's posttrial contentions, petitioner has been denied

the opportunity to develop evidence regarding, among other things, the appropriate allocation of expenses if we were to find two or more separate activities--an issue as to which the record currently is silent.

In any event, even if we were to consider respondent's new "separate activity" argument, we would be unpersuaded of its merits. Section 1.183-1(d)(1), Income Tax Regs. (to which respondent has not alluded), provides as follows:

> In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. * * * [Emphasis added.]

We do not believe that petitioner's characterization of his Schedule C activities as one activity is "artificial and cannot be reasonably supported under the facts and circumstances of the case." Id. The facts indicate substantial linkage between

petitioner's providing photographic and other services to PSI, his taking steps to build up his own reputation and expertise in the field of photography, his marketing of his own prints, his production of photography exhibitions, and his future plans to expand into such areas as the teaching of photography. We also find it significant that in his books and records petitioner has treated the various undertakings as one activity.

In sum, on the basis of all the evidence in the record, we conclude and hold that petitioner had a good faith expectation of profit from his Schedule C activity during the years in issue. Accordingly, petitioner is entitled to the Schedule C deductions in issue, the parties having stipulated that the amounts claimed are adequately substantiated.

Unreimbursed Employee Business Expenses

On Schedule A, Itemized Deductions (Schedule A), of his 1995 Federal income tax return, petitioner claimed deductions for "unreimbursed employee expenses" of $8,291, comprising $7,529 of claimed automobile mileage expenses and $762 of claimed expenses described on the Schedule A only as "other". Respondent has disallowed the $8,291 claimed deduction on the ground that it is inadequately substantiated.[6] On brief, petitioner argues only

---

[6] The parties have stipulated that petitioner is entitled to specified amounts of "unreimbursed employee expenses" and "car and truck expenses" that he claimed for taxable years 1993 and 1994.

that he is entitled to a deduction of $7,529, representing automobile mileage expenses that he incurred in 1995 in connection with his Compuware employment.  Accordingly, we find that petitioner has conceded that he is not entitled to deduct the $762 of claimed "other" expenses.  See, e.g., Theodore v. Commissioner, 38 T.C. 1011, 1041 (1962).

Section 274(d) imposes strict substantiation requirements for deducting expenses relating to listed property, defined in section 280F(d)(4)(A)(i) to include passenger automobiles.  See sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  Under these requirements, no deduction is allowable on the basis of any approximation or the taxpayer's unsupported testimony.  Sanford v. Commissioner, 50 T.C. 823, 826-827 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., supra.

To meet the heightened substantiation requirements of section 274(d), the taxpayer must substantiate the claimed deduction with adequate records, or by sufficient evidence corroborating the taxpayer's own statement, showing the amount of the expense, the time and place of the use of the listed property, and the business purpose.  Sec. 274(d); see also sec. 1.274-5T(b)(6), (c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46016, 46017 (Nov. 6, 1985).  Employee use of listed property is not treated as satisfying the business use requirement unless the

use is for the convenience of the employer and is required as a
condition of employment.  See sec. 1.274-5T(b)(6) (flush
language), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov.
6, 1985); sec. 1.280F-6T(a)(1), Temporary Income Tax Regs., 49
Fed. Reg. 42713 (Oct. 24, 1984).

Petitioner claimed mileage expense deductions based on his
application of the Federal standard mileage rates to miles he
alleges he drove in business travel.  Use of the Federal standard
mileage rates serves only to substantiate the amount of expenses
and not the remaining elements of time and business purpose.  See
Rev. Proc. 94-73, 1994-2 C.B. 816.

Petitioner has offered into evidence a computer printout
(the mileage log) with daily listings, for almost every day of
1995, of multiple business trips identified only by abbreviations
under a column captioned "client".[7]  Petitioner testified without
elaboration that all of the business miles listed on the mileage
log were "related" to his employment with Compuware.  Nowhere
does the record reveal, however, the nature of petitioner's
purported travel for Compuware, much less the business purpose of
each trip recorded on the mileage log.  Having failed to show
that the use of the vehicle or vehicles in question was for the
convenience of Compuware and required as a condition of his

---

[7] The record does not reveal what vehicle or vehicles were
involved in these business trips or who owned the vehicles.

employment, petitioner has failed to substantiate business purpose as required by section 274.[8]

In conclusion, petitioner has failed to satisfy the section 274 substantiation requirements for the $8,291 of unreimbursed employee expenses that he claimed on his 1995 Schedule A. Accordingly, he is not entitled to the claimed deduction.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[8] We also note seeming irregularities involving petitioner's mileage log. Petitioner testified that none of the business miles listed related to his Schedule C business, yet for many of the business miles, the mileage log lists the client as "PSI", which we infer is the same PSI for which JJT performed services. In addition, for those dates for which personal mileage is recorded, the mileage log invariably lists either 4, 5, or (more typically) 6 miles of personal travel for the day, for a total of 796 personal miles, compared with 25,096 total business miles recorded. Consulting our own experience, it seems improbable that petitioner's daily personal use of his vehicle would be so rigidly fixed and limited, especially in light of the much larger number of business miles he recorded in 1995.