# United States Tax Court

T.C. Summary Opinion 2024-9

CAROL A. WRIGHT, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos.   4538-19S,   4539-19S,          Filed June 10, 2024.
              17520-19S,   17521-19S,
              7813-20S.

————————

Carol A. Wright, pro se in Docket Nos. 4538-19S and 17521-19S.

Steve M. Wright and Tami A. Wright, pro se in Docket Nos. 4539-19S, 17520-19S, and 7813-20S.

*Matthew A. Houtsma*, *Gretchen W. Altenburger*, *Michael T. Garrett*, and *Jonathan D. Walker*, for respondent in Docket No. 4538-19S.

*Gretchen W. Altenburger*, *Andrew J. Davis*, *Michael T. Garrett*, and *Jonathan D. Walker*, for respondent in Docket No. 4539-19S.

*Gretchen W. Altenburger*, *Melinda K. Fisher*, *Michael T. Garrett*, and *Jonathan D. Walker*, for respondent in Docket Nos. 17520-19S, 17521-19S, and 7813-20S.

———————————————

[1] Cases of the following petitioners are consolidated herewith: Carol A. Wright, Docket No. 17521-19S; and Steve M. Wright and Tami A. Wright, Docket Nos. 4539-19S, 17520-19S, and 7813-20S.

## SUMMARY OPINION

HALPERN, *Judge*: These cases were heard pursuant to the provisions of section 7463[2] of the Internal Revenue Code in effect when the Petition was filed. Pursuant to section 7463(b), the decisions to be entered are not reviewable by any other court, and this Opinion shall not be treated as precedent for any other case.

Respondent issued two deficiency notices to petitioner Carol A. Wright (Carol) determining deficiencies in her 2014 and 2015 (calendar year) income tax of $2,168 and $1,065, respectively, and accuracy-related penalties of $434 and $213, respectively.

Respondent issued three deficiency notices to petitioners Steve M. Wright (Steve) and Tami A. Wright (Tami) determining deficiencies in their 2014, 2015, and 2016 (calendar year) income tax of $18,026, $13,130, and $15,524, respectively, and accuracy-related penalties of $3,605, $2,626, and $3,104, respectively.

Respondent has conceded all the accuracy-related penalties. We accept those concessions.

After additional concessions,[3] the issues for decisions are as follows:

1. Whether Carol and Steve are entitled to deduct various flowthrough business expenses reported on Schedule E, Supplemental Income and Loss, for an S corporation, All Professional Realty, Inc. (APR), for taxable years 2014 and 2015;

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[3] In the First Stipulation of Facts, described *infra*, the parties agree to 15 adjustments made in the various statutory notices. We accept those agreed adjustments and, with one exception, will not further discuss them. The exception is that, in paragraph 86 of the Stipulation, the parties stipulate an adjustment to Other Income of $4,736 for Steve and Tami for 2014. Exhibit 4-J, the 2015 deficiency notice issued to Steve and Tami, shows on page two that the adjustment was made for 2015. We assume that is correct.

2. Whether Steve and Tami are entitled to deduct various expenses reported on Schedule C, Profit or Loss From Business, for a restaurant, Love at First Bite Café (Café), for taxable years 2014, 2015, and 2016; and

3. Whether Steve and Tami are entitled to deduct various Schedule C business expenses for a construction business for taxable years 2014, 2015, and 2016.

Petitioners bear the burden of proof. *See* Rule 142(a).[4]

## *Background*

### *Introduction*

The parties have filed a First Stipulation of Facts stipulating certain facts and the authenticity of certain documents. The facts stipulated are found, and the documents stipulated are accepted as authentic.

Carol, Steve, and Tami all resided in California when they filed their Petitions. During the years at issue, Steve was married to Tami. Previously, Steve was married to Carol.

### *Income Tax Returns and Adjustments*

For each of 2014 and 2015, Carol filed Form 1040, U.S. Individual Income Tax Return. For 2014, 2015, and 2016, Steve and Tami likewise filed Forms 1040 (electing joint return status). For 2014, Steve and Tami filed Form 1040X, Amended U.S. Individual Income Tax Return.

#### *Schedules E*

In 2014 and 2015, Steve and Carol were equal owners of APR (also a calendar year taxpayer). For those years, APR filed Forms 1120S, U.S. Income Tax Return for an S Corporation. On those forms, APR reported total income, deductions, and ordinary business income or loss as follows.

---

[4] We will sometimes use the plural noun "petitioners" to refer to Carol, Steve, and Tami, together, when individuation is unnecessary, e.g., when speaking of the arguments petitioners make on their joint brief.

| Description | 2014 | 2015 |
|---|---|---|
| Total income | $311,306 | $293,041 |
| Deductions | 299,122 | 295,370 |
| Ordinary business income (loss) | 12,184 | (2,329) |

For 2014 and 2015, APR prepared Schedules K–1 (Form 1120S), Shareholder's Share of Income, Deductions, Credits, etc., for each of Steve and Carol reporting his or her share of APR's ordinary business income or loss for the year, viz, for 2014, reporting $6,092 to each and, for 2015, reporting $1,164 to Carol and $1,165 to Steve. Carol and Steve reflected the K–1 amounts on Schedules E attached to their Forms 1040.

Respondent examined APR's 2014 and 2015 Forms 1120S and disallowed a portion of the claimed deductions. Those disallowances resulted in his making positive adjustments to APR's business income for each year and, consequentially, also making positive adjustments to the amounts Carol and Steve had reported as their Schedule E (flowthrough) income from APR. The adjustments to APR's income that remain in dispute are as follows.

| Description | Adjustment 2014 | Adjustment 2015 |
|---|---|---|
| Depreciation | — | $2,196 |
| Other deduction: auto | $17,357 | 16,634 |
| Other—home office | 6,555 | 6,910 |
| Other—travel | 10,300 | 8,500 |
| Other—office expense | 3,529 | 4,522 |

The relevant deficiency notices explain that the adjustments were made, variously, for APR's failure to substantiate the business purpose of the expense, that it was actually incurred, that it was made during the taxable year, and, for the travel expenses, that the enhanced substantiation requirements for travel expenses were met.

There is also a 2015 APR Schedule E income adjustment of $1,895 for Steve.

*Schedules C—Café*

Steve and Tami included with each of their 2014 through 2016 Forms 1040 a Schedule C for Café, which, in 2014, was a food service business offering catering services but which, in 2015 expanded to a

brick and mortar restaurant. Each of those Schedules C shows the year's gross receipts or sales, which is then reduced by (1) cost of goods sold and (2) itemized expenses (including any amount claimed for the business use of a home), the difference being entered as the year's profit or loss.

The following table shows those entries on Café's Schedules C.

| Schedule C—Café | | | |
|---|---|---|---|
| Description | 2014 | 2015 | 2016 |
| Gross receipts or sales | $3,122 | $228,956 | $453,623 |
| Cost of goods sold | (30,769) | (293,251) | (477,072) |
| Expenses | (66,776) | (98,794) | (179,317) |
| Net profit (loss) | (94,423) | (163,089) | (202,766) |

Respondent made numerous adjustments to Café's Schedules C. The following table shows the adjustments that remain in dispute. Respondent explained his disallowance of costs of goods sold on the grounds that the amounts disallowed had not been verified. He explained disallowance of the various deductions on the grounds that the amounts had not been shown to have been paid or incurred during the taxable years or to have been ordinary and necessary expenses of carrying on a trade or business.

| Café Schedule C Adjustments in Dispute | | | |
|---|---|---|---|
| Description | Adjustment 2014 | Adjustment 2015 | Adjustment 2016 |
| Gross receipts or sales | — | — | $58,473 |
| Cost of goods sold | — | $11,529 | — |
| Meals and entertainment | $2,680 | 9,391 | — |
| Travel | 10,720 | — | — |
| Legal and professional | 7,695 | — | — |
| Car and truck expenses | 8,250 | — | — |
| Business use of home | 1,176 | 385 | — |
| Other expenses | 2,690 | — | — |
| Interest-other | 4,400 | 3,987 | — |
| Contract labor | (7,056) | — | — |

*Schedules C—Construction Business*

Steve and Tami included with each of their 2014 through 2016 Forms 1040 a Schedule C for an unnamed construction business. The following table shows the entries for gross receipts or sales, costs of goods sold, expenses (including for business use of a home), and losses reported for the business.

| Schedule C—Construction Business | | | |
|---|---|---|---|
| *Description* | *2014* | *2015* | *2016* |
| Gross receipts or sales | $6,305 | $18,100 | $18,000 |
| Cost of goods sold | (15,104) | (17,300) | (6,320) |
| Expenses | (10,772) | (10,543) | (18,633) |
| Net profit (loss) | (19,571) | (9,743) | (6,952) |

The following tables show the adjustments to the construction business Schedules C that remain in dispute. Respondent explains that he made his construction business Schedule C adjustments because petitioners had not shown the existence of any construction business, nor had they shown that the reported expenses were ordinary and necessary business expenses or that they were expended for any allowable purpose.

| Construction Business Schedule C Adjustments in Dispute | | | |
|---|---|---|---|
| *Description* | *Adjustment 2014* | *Adjustment 2015* | *Adjustment 2016* |
| Gross receipts or sales | ($6,305) | ($18,100) | ($18,000) |
| Cost of goods sold | 4,688 | 17,300 | 6,320 |
| Meals and entertainment | 2,600 | 534 | 6,551 |
| Car and truck expenses | 4,757 | 3,683 | — |
| Office expenses | 2,890 | 3,088 | 7,369 |
| Taxes and licenses | — | 690 | — |
| Business use of home | — | 605 | — |

*Assignments of Error*

The principal adjustment in both notices sent to Carol is the Schedule E flowthrough adjustment resulting from respondent's examination of APR. Carol assigns no particular error to the adjustments, but, in response to the 2014 deficiency notice, she states her cases were tied to Steve and Tami's.

Steve and Tami assign error to respondent's Schedule E and Schedule C adjustments in all three notices. They complain that the auditor's adjustments were arbitrary and ignored the "proof" they provided.

*Petitioners' Evidence*

We held a one-day trial in these cases, during which Carol, Steve, and Tami all testified. In addition to their testimony, petitioners rely on 44 Exhibits. In general, each Exhibit is associated with a particular expense respondent disallowed, and the Exhibit's contents are described as documents submitted to respondent for the expense. For example, petitioners describe Exhibit 20-P as "documents submitted for claimed meal and entertainment expenses for [Café] in 2014."

The 44 Exhibits comprise 1,882 pages. Those pages reproduce even more thousands of photocopied bills, receipts, and other claimed evidence of payments. Some of the photocopies show handwritten annotations on the copied document. Some of the Exhibits contain copies of adding machine tapes, although many of those tapes are only partially complete.

By the conclusion of the trial, it became clear that petitioners' thousands of individual receipts and other evidence of payments were insufficient by themselves to prove that they had incurred any amount greater than the amount (if any) respondent allowed for a particular category of expenditure, e.g., cost of goods sold or meals and entertainment. Steve acknowledged that it was his burden to go through the receipts and explain "what[,] why, and when."

Moreover, during respondent's cross-examination of Steve, questions arose about the genuineness of certain meal checks and credit card receipts he offered as evidence of business-meal expenses. Steve testified that he annotated all meal checks and credit card receipts for business meals with the business purpose of the meal and the identity of the people attending. He explained that he would add the tip, sign

the document, give the restaurant its copy, and keep the copy he had annotated as a business record. However, examination of a few of the meal checks and credit card receipts in evidence suggested that some deductions for meals might have been contrived, in that the exhibits included, for what appeared to be the same meal charge (i.e., total for food, beverage, and tax), both an itemized meal check received from the restaurant and a copy of a credit card receipt evidencing payment to the restaurant, except that the meal check and the corresponding receipt listed different attendees and different tip amounts for the same meal charge. Steve explained that, occasionally, he would have two business lunches on the same day, with different people, incurring the same meal charge for each meal, but leaving different tip amounts.

We set a schedule for seriatim briefs, petitioners to go first, respondent to answer, and, if they wished, petitioners to reply. We directed petitioners' attention to Rule 151. Rule 151(e)(3) requires that an opening brief contain proposed findings of fact in the form of numbered concise statements of essential fact, each statement supported by reference to the pages of the transcript, or the exhibits or other sources relied on in support of the proposed finding. We emphasized that, for every factual statement on which they wanted us to rely, petitioners had to point to either a page and line of transcript or an exhibit that makes the point. We suggested that petitioners prepare and attach to their Brief a spreadsheet listing the adjustments that remained at issue and pointing us to where in the record we could find, for each adjustment, evidence that the disallowed amount was an ordinary and necessary business expense, that the full amount reported was paid, and that any special requirement was satisfied (e.g., the names of attendees at a business meal). Thus, for example, there would be a line item showing that information for each meal expenditure claimed as deductible.

*Discussion*

I.    *Introduction*

Except for a 2015 APR Schedule E income adjustment of $1,895 for Steve, the adjustments relating to APR all involve deductions. The adjustments to the Schedule C activities involve not only deductions but also a positive adjustment to Café's gross receipts for 2016 and negative adjustments to the construction business's 2014 through 2016 gross receipts. Because Steve and Tami do not pursue on brief any argument with respect to the 2015 APR Schedule E income adjustment for Steve

or the 2014 through 2016 negative adjustments to the construction business's gross receipts, we assume there is nothing for us to decide with respect to those adjustments. *See, e.g.*, *Theodore v. Commissioner*, 38 T.C. 1011, 1041 (1962); *Bell v. Commissioner*, T.C. Memo. 1990-171, 1990 Tax Ct. Memo LEXIS 197, at \*11 ("[W]here an issue is in controversy and one of the parties fails to address that issue on brief . . . , we have held that the failure to address the issue on brief is tantamount to a concession of the issue.").

II.  *Café's 2016 Gross Receipts*

Steve and Tami reported on Café's 2016 Schedule C gross receipts of $453,623.  Respondent increased that amount by $58,473.  On brief, Steve and Tami direct us to Exhibit 43-P, which contains bank statements for Café and an explanation that alleges that errors occurred with recordkeeping (using QuickBooks) for Café's deposits because "Tami was still working full time at Intel and trying to run the café. . . . [And] she had a friend help with posting transactions into QB for her." Amounts that should have been entered as income were entered as owner's equity because of a classification error by QuickBooks.  The Exhibit also includes a reconciliation, claimed to balance "to the penny," that shows that the amount of underreported income was not $58,473 as respondent claims but only $21,710.  In his Brief, respondent concedes that the adjustment to Café's gross receipts for 2016 should be $21,710.  We accept that concession.

III.  *Deductions*

A.  *Introduction*

In general, section 162 allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." When called upon by the Commissioner, a taxpayer must substantiate his expenses. *See, e.g.*, *Akey v. Commissioner*, T.C. Memo. 2015-227, at \*20; *see also* § 6001; Treas. Reg. § 1.6001-1(a).  In deciding whether a taxpayer has satisfied his or her burden of substantiating a deduction, we are not required to accept the taxpayer's testimony. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).  Moreover, certain deductions, including those relating to travel, meals, and entertainment, are subject to heightened substantiation requirements. *See* § 274(d).  For such deductions, the taxpayer must substantiate by adequate records or sufficient evidence to corroborate the taxpayer's own testimony (1) the amount of the

expenditure or use based on the appropriate measure; (2) the time and place of the expenditure or use; (3) the business purpose of the expenditure or use; and (4) in the case of entertainment, the business relationship to the taxpayer of each person entertained. *See* § 274(d); Temp. Treas. Reg. § 1.274-5T(b).

B.     *Petitioners' Substantiation*

1.     *Introduction*

We warned petitioners at trial that the volume of their exhibits—almost 2,000 pages reproducing even more thousands of photocopied receipts and the like—would alone be too voluminous without further direction to determine sufficiency. We instructed them on how to make proposed findings of fact. We suggested that petitioners attach to their Brief a spreadsheet addressing each contested adjustment. Except with respect to providing a spreadsheet for meals and entertainment, petitioners have not heeded our advice.

2.     *Evidence and Arguments*

a.     *Introduction*

Petitioners' proposed findings of fact are of a pattern. Organized by the individual adjustments that respondent made (e.g., "2014 Construction Meals and Entertainment"), petitioners state the amount of respondent's adjustment, reference an exhibit that they claim contains evidence substantiating a deduction of that or some other (usually greater) amount, occasionally reference a few lines of testimony, and then propose that we allow a deduction in that amount.

b.     *One Example*

Remaining at issue are the following adjustments to the costs of goods sold claimed on the construction business Schedules C.

| Description | Adjustment 2014 | Adjustment 2015 | Adjustment 2016 |
|---|---|---|---|
| Cost of goods sold | $4,688 | $17,300 | $6,320 |

On brief, petitioners propose that, with respect to the 2014 adjustment, we find: "The Notice of Deficienc[y] . . . shows $4,688. At trial the Petitioners entered into evidence **Exhibit 29** which provides copies of receipts totaling $8,614."

The referenced Exhibit, Exhibit 29 (actually Exhibit 29-P), which is stipulated to be "documents submitted for claimed Cost of Goods Sold for the Schedule C Construction Activity in 2014," comprises 47 pages reproducing more than 100 photocopied receipts from various vendors. A portion of an adding machine tape copied to the first page of the Exhibit sums to $8,614 but contains only 19 addends, summing to $4,411. The addends are not further associated with particular receipts.

On that basis, petitioners argue: "[They] should be awarded the deduction of the Cost of Goods Sold, as the Petitioners provided sufficient evidence and testimony that the expenses were ordinary and necessary in the course of their businesses. . . . [E]vidence submitted provide[s] copies of receipts totaling $8,614."

Petitioners' approach for 2015 and 2016 is similar, relying on two Exhibits comprising 125 pages of photocopied receipts and, for 2015, an incomplete adding machine tape.

### 3. *Another Example*

The adjustments to APR's Forms 1120S for 2014 and 2015 that remain in dispute are as follows.

| Description | Adjustment 2014 | Adjustment 2015 |
|---|---|---|
| Depreciation | — | $2,196 |
| Other deduction: auto | $17,357 | 16,634 |
| Other—home office | 6,555 | 6,910 |
| Other—travel | 10,300 | 8,500 |
| Other—Office expense | 3,529 | 4,522[5] |

Petitioners propose that we find the adjusted amounts deductible on the basis of the contents of three stipulated exhibits. For 2014, petitioners rely on a single Exhibit, Exhibit 59-P, described as 2014 office expenses. For 2015, petitioners rely on two exhibits, one, Exhibit 60-P, described as 2015 travel expenses, and the second, Exhibit 61-P, described as 2015 office expenses. The three Exhibits comprise 174 pages, 23 pages, and 317 pages, respectively, of photocopied receipts.

---

[5] APR claimed a deduction of $13,526 on the 2015 Form 1120S. Respondent's disallowance was only partial, viz, $4,522.

Petitioners propose no breakdown of the two "office expense" Exhibits, Exhibits 59-P and 61-P. They do not segregate the various receipts by categories, i.e., home office, auto, or office expense, nor do they identify the business purpose of any particular expenditure. Nevertheless, they argue: "Petitioners are entitled to the full deduction of the Home Office and Office Expenses, as the expenses were ordinary and necessary in assisting the Petitioners in doing business."

With respect to Exhibit 60-P, relating to 2015 travel expenses, they argue that they "submitted evidence and testimony that confirms that they met the spirit and intent of the [relevant] IRS regulations." The only testimony they cite is Carol Wright's response when asked by respondent's counsel what travel the 2014 reported expenditure of $10,300 was for. She answered: "I don't know."

### 4. *Meals and Entertainment*

The following Schedule C adjustments to meals and entertainment remain in dispute.

| Description | 2014 | 2015 | 2016 |
| --- | --- | --- | --- |
| Café | $2,680 | $9,391 | — |
| Construction business | 2,600 | 534 | $6,551 |

In their testimony and on brief, petitioners direct us to five exhibits, Exhibits 20-J through 24-J, all described as "documents submitted for claimed meal and entertainment expenses." The first two relate to Café for 2014 and 2015, while the remaining three relate to the construction business for 2014 through 2016. In total, the five Exhibits comprise 135 pages reproducing a greater number of photocopies of restaurant meal checks, credit card receipts, and monthly statements from North Ridge Country Club. Most, if not all, the photocopies show handwritten annotations. Petitioners claim that they have provided copies of receipts totaling as follows.

| Description | 2014 | 2015 | 2016 |
| --- | --- | --- | --- |
| Café | $8,795 | $8,691 | — |
| Construction business | 20,973 | 1,495 | $46,396 |

Petitioners argue:

> [They] feel that they have provided sufficient evidence and testimony that supports the spirit and intent of meeting the [sic] **IRS Section 274, §1.274-5T(c)(1) and IRS § 1.274-5T(c)(2).** As such, the Petitioners are entitled to the full deduction of Meals & Entertainment Expenses, as the expenses were ordinary and necessary in assisting the Petitioners in doing business.

In response to our suggestion at trial that petitioners support their claimed deductions with a spreadsheet, they have attached to their Brief a 34-page spreadsheet detailing, at respondent's count, 278 claimed business meals across three years. The spreadsheet includes the following column titles.

| Tax year | Ex. No. | Ex. Page No. | Date | Venue | Attendees | Amount | Reason for Event |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

For many of the entries, the spreadsheet does not merely reproduce the annotations of the purpose handwritten on meal checks and credit card receipts but elaborates on those annotations or supplies text that is illegible on the original receipt. For example, on an April 17, 2014, meal check is the notation "C21 legal," with appears on the spreadsheet as "renewal/keep C21 legal investment Golf Course purchase and clubhouse." Some names of individuals other than Steve or Tami lack a surname.

C.      *Discussion*

1.      *In General*

In support of their claim that they have adequately substantiated the deductions that respondent disallowed, petitioners have presented us with just the situation we told them to avoid. They offer a hodgepodge of receipts that left respondent unconvinced. They ask us to accept the receipts, bundled into separate exhibits for each disallowed expense, as substantiation that they spent some stated amount for the disallowed expense and that the expenditure constituted an ordinary and necessary business expense for the related activity (i.e., either APR on one of the Schedule C activities). Petitioners' approach brings to mind the shoebox method of presenting evidence. *See Patterson v. Commissioner*, T.C. Memo. 1979-362, 1979 Tax Ct. Memo LEXIS 162, at *7 (defining the

unacceptable shoebox method as: "attaching photocopies of numerous cash register tapes and of similar bits of paper to [the taxpayer's] return[], without making any effort on the return[] or on brief, and only a slight effort in oral testimony, to link any item to a deductible trade or business expense transaction").

We need not (and will not) undertake the task of sorting through the voluminous Exhibits petitioners have provided in an attempt to see whether they have provided adequate substantiation to counter respondent's adjustments. *See Venuto v. Commissioner*, T.C. Memo. 2017-123, at *9; *Akey*, T.C. Memo. 2015-227, at *21. Postponing for a moment discussion of respondent's Schedule C meal and entertainment expense adjustments, addressed in their spreadsheet, petitioners have failed to carry their burden of proof with respect to respondent's remaining adjustments.

### 2. *Meals and Entertainment—the Nine Martini Lunch*

While the spreadsheet attempts to extricate from Exhibits 20-J through 24-J data necessary to substantiate each claimed meal expense, we do not believe that the data portrayed is fully credible or reliable. As described above, during respondent's cross-examination of Steve, respondent raised the suspicion that some deductions for meals were contrived, in that the exhibits included, for what appeared to be the same meal charge, both a meal check received from the restaurant and a copy of a credit card receipt evidencing payment to the restaurant of the amount of the meal charge, except that the meal check and the corresponding receipt listed different attendees and different tip amounts. Petitioners have entered on their spreadsheet numerous pairs of like meal checks and credit card receipts.

Respondent has provided us with his own spreadsheets analyzing Steve and Tami's meal expenses. One spreadsheet shows 28 pairs of itemized meal checks and credit card receipts. The check and receipt of each pair are from the same restaurant, show the same date, and report the same meal charge. For 25 of the pairs, the check and receipt show the same check number or some other evidence of correspondence. For the other three pairs, the check number is either completely or partially illegible on either or both meal check and receipt. The meal checks and the receipts also show what we assume to be the time the documents were printed, and, for each pair, the time of the meal check precedes the time of the credit card receipt. The longest interval between meal check and receipt is about 1 hour 45 minutes. Nine show an interval of

2 minutes or less. The attendees and business purpose annotated on each member of a pair differ, as, sometimes, do the tip amounts. And while it is possible that the paired meal checks and receipts show that Steve had successive business meals on the same day and did not receive the meal check for the first meal until just as he was paying by credit card for the second meal, we are suspicious of that because the lack of a credit card receipt for any of the first meals in a pair suggests that he paid cash for the first meal, yet the check number on the credit card receipt for the second meal in the pair suggests that that the claimed second-meal receipt is evidence of his payment for the first meal. There is no other evidence of payment for the first meals, and petitioners offer no solution to this puzzle. A solution that occurs to us is that each pair evidences only one meal expenditure and at least one member of each pair is fabricated evidence of a business meal that did not happen.

Moreover, 6 of the 28 itemized meal checks in respondent's list of pairs lead us to question whether those 6 meals were business meals at all. Meal checks dated February 6, March 20, April 17, May 5 and 20, and August 5, 2014, all show one "Chicken Caesar Salad" and, seven, six, six, seven, six, and nine "gins," respectively. The attendees that Steve noted for four of those meals were only himself and Tami. At trial, he testified that, while he drank gin, if Tami were at a meal, she drank wine. At least with respect to those four meals, we do not accept that anyone but Steve attended or that the meal served any business purpose. Nor are we persuaded that anyone other than Steve attended the other two meals or that they served any business purpose.

Because we believe that petitioners' spreadsheet shows fabricated evidence, and because some of the meal checks appear inconsistent with a lunch for more than one person, we are not willing to accept Exhibits 20-J through 24-J as substantiating business meal or entertainment expenses beyond those respondent allowed. *See Brown v. Commissioner*, T.C. Memo. 1985-269, 1985 Tax Ct. Memo LEXIS 363, at *8 ("[W]here it becomes apparent that some evidence tendered by [the taxpayers] is not trustworthy, we must regard [the taxpayers'] credibility as so damaged that their uncorroborated testimony is insufficient on any other issue as to which they bear the burden of proof.").

To reflect the foregoing,

*Decisions will be entered under Rule 155.*